HOPPER S. MOTT and Others, Appellants, Respondents, *v.* AMOS F. ENO, Respondent, Appellant.

*Presumption that the title to the fee of a country road is in the abutting owners —*
*— Bloomingdale road was not in existence during the Dutch occupancy of New*
*York city — the title to the fee of that road was in the abutting owners — the fee*
*was not taken by the city under chapter 61 of the Laws of 1787 nor under chapter*
*203 of the Laws of 1847 nor under chapter 890 of the Laws of 1869 — title to the*
*fee could not be acquired by the city without an award of damages — an indorse-*
*ment on the back of a report of commissioners of appraisal is evidence of its con-*
*firmation — the payment for land outside a road does not estop the owner from*
*claiming the fee of the road — title was not acquired by the city by adverse posses-*
*sion — what description conveys the fee of the road — what deed, although it refers*
*to the lot number on a map describing the road, does not — on the discontinuance*
*of a public or private road the title reverts to the abutting owners — a conveyance*
*of land bounding it on a road creates an easement in the road.*

There is a presumption that an open road existing in a country, subject to the rules of the common law, is a road the fee of which is vested in the abutting owners, the public having only an easement therein. Such presumption is based on the theory that the road was originally taken from the adjoining owners for the sole purpose of being used for a thoroughfare.

In the case at bar it was held that there was no evidence that the Bloomingdale road in the city of New York was opened as a road during the time that such city was in the occupation of the Dutch government, and that, therefore, the fee of this road was vested in that government, and that upon the conquest of New Netherlands by the English the fee of that road became vested in the English crown and was transferred by the early charters to the city of New York.

It was also held that there was no evidence tending to show that the Bloomingdale road was a public highway prior to the transfer of the colony of New York to the British government; also that there was applicable to such road the ordinary presumption that the fee of a road opened under the common law remained in the former owners of the property and that the public acquired a mere easement in such road.

The fee of the land included in the Bloomingdale road was not taken by the city of New York under chapter 61 of the Laws of 1787.

The fact that, in certain proceedings of the common council of the city of New York, the Bloomingdale road was ordered to be widened to its full width of four rods and that a committee of the common council was appointed to open the road and to confer with the abutting owners upon the subject, does not, in the absence of evidence that any proceedings were taken under this resolution or that any award was made to the owners of the abutting property, establish that the city acquired title to the fee of the road.

The proceedings taken by the city of New York, under chapter 203 of the Laws of 1847, did not operate to vest in the city the fee of the Bloomingdale road, for the reason that the report of the commissioners of estimate and assessment

appointed in the proceedings did not specify the fee of the street as a portion of the land taken and did not make any award for the fee of the street to the owners thereof.

*Semble*, that if the commissioners had determined that the interest of the owners of the fee of the road, subject to the easement therein, was of merely nominal value, and had made a nominal award to such owners, and their report had been confirmed, then there would have been an adjudication as to the value of the interest of the owners of the fee, which would have been binding upon the owners, and such fee would thereupon have vested in the city of New York.

No adjudication was made in such proceedings that the city was the owner of the fee of the road.  ·

Under the constitutional provision that no person shall be deprived of life, liberty or property without due process of law, and that private property shall not be taken for public use without compensation, neither the State nor the city of New York could deprive the owners of the fee of the Bloomingdale road of such ownership without paying therefor.

An indorsement upon the back of the report of the commissioners made in the proceedings under the act of 1847, signed by the clerk of the Supreme Court, to the effect that the report had been confirmed by·the court, is, in itself, evidence of such confirmation, even though no formal order of confirmation was entered and, when coupled with proof of the publication of notice of the confirmation of the report and of the imposition of an assessment for the costs and of the payment of awards, justifies a finding that the report was confirmed.

The payment to one of the abutting owners on the Bloomingdale road, who was made a party to the proceedings under the act of 1847, of a substantial award, made to him for land taken in the proceedings located outside the road as it existed previous to the institution of the proceedings, does not estop the successor in title of such owner from insisting that the city did not acquire the fee of the road in those proceedings.

The city of New York has not acquired the fee of the Bloomingdale road by adverse possession since the proceedings under the act of 1847, as it does not appear that either it or the public claimed any other or greater right in the road, after the confirmation of the proceedings taken under the act of 1847, than they had previously exercised.

A deed, which described the premises conveyed as beginning at a point on the Bloomingdale road and running thence by metes and bounds back to the Bloomingdale road and thence along the Bloomingdale road to the place of beginning, conveyed title to the fee to the center of the road.  .

Under the judgment, entered March 31, 1864, in the action brought to partition the real property of which John Hopper,the younger, died seized, the fee of the Bloomingdale road was included with the abutting property and the conveyance to Garrit S. Mott, under such decree, of lots abutting on the Bloomingdale road operated to convey to said Garrit S. Mott title to the center of the road in front of such lots.

The said Garrit S. Mott having, in the subsequent conveyances of these lots to Dudley Field, in March, 1865, adopted a description in which, by metes and bounds, he excluded the fee of the Bloomingdale road, the title to such fee

still remains in the successors in title of the said Garrit S. Mott and not in the successors in title of the said Dudley Field.

A mere reference in such description to a map which bounds the lots on the Bloomingdale road is not sufficient in itself to convey the fee to the center of the road.

Chapter 890 of the Laws of 1869, relative to the widening of Broadway, formerly the Bloomingdale road, which provides, " if any part or parts of Broadway shall be closed under the provisions of this act, any owner of land now fronting on Broadway, abutting on any part so closed, may acquire an exclusive right, title and interest of, in and to so much of any part so closed as lies between the present front line of the land owned by him and the line of Broadway as it may be so as aforesaid located and established * * * upon paying to the cham-berlain of the city of New York, for the mayor, aldermen and commonalty of the said city, the amount of any award by the said commissioners of estimate and assessment, for the discontinuance of the public use of the land such owner is so entitled to acquire, and also paying to the said chamberlain, for the parties entitled thereto, the amount of any award by the said commissioners for the reversionary interest in such lands, or any part thereof; * * * but no award shall be made for the reversionary interest, in case the parties having such interest shall be entitled to acquire the land," did not operate to divest the said Garrit S. Mott and his successors in title of the ownership of the fee of any part of the Bloomingdale road and vest such title in Dudley Field or his suc-cessors in title.

Where a road, the fee of which is in a private individual, is subject to a public easement of travel, if the public discontinue the use of the road the land within the road reverts to the private individual discharged from the public easement to which it has before been subject.

When a person owning property abutting upon a public or private road, conveys the abutting property to another, bounding it upon the road, he subjects his interest in the road to an easement in favor of the property conveyed.

McLAUGHLIN and HATCH, JJ., dissented on the ground that the proceedings under chapter 203 of the Laws of 1847 operated to vest the title to the fee of the Bloom-ingdale road in New York city.

VAN BRUNT, P. J., dissented.

CROSS-APPEALS by the plaintiffs, Hopper S. Mott and others, and by the defendant, Amos F. Eno, from a judgment of the Supreme Court, entered in the office of the clerk of the county of New York on the 29th day of June, 1903, upon the report of a referee.

*James A. Deering,* for the plaintiffs.

*David B. Ogden,* for the defendant.

INGRAHAM, J.:

The argument in this case has extended over a wide range, involving the consideration and construction of wills and convey-

ances of real estate, judgments in partition, and proceedings and statutes in relation to the opening and closing of Bloomingdale road, extending over a period of 200 years. It would be impossible, within the limits of a judicial opinion, to discuss all of the questions involved. The action is in ejectment, and the chain of title and the various instruments upon which it is based are set forth in the opinion of the learned referee.* We agree with the referee that there was no evidence to show that Bloomingdale road was opened prior to the conquest of New York by the British. It is possible that a country road was in use, a part of which was subsequently called Bloomingdale road, prior to the passage of the act of the Colonial Legislature in 1703 (1 Col. Laws N. Y. [Comp. Stat. Rev. Com.] 532, chap. 131). The return of the commissioners appointed by that act, dated June 16, 1707, certifies that they have "viewed and laid out" a road, which would seem to have been identical with the Bloomingdale road as it subsequently existed; and this action of the commissioners under the act of 1703 is the first indication that a public road was established at this locality.

The road thus laid out was located "forward as the said Road now lyes unto Thennis Edis's and Capt. D'Kens thro' the said Edis's land," which would indicate that at the time this report was made the road from Great Kills was in existence; but there is nothing to show that prior thereto it was a public road.

An act passed November 25, 1751 (3 Col. Laws N. Y. [Comp. Stat. Rev. Com.] 844, chap. 910), recites that in pursuance of the act of 1703 "the Commissioners therein named for the City and County of New York did lay out a Road of the breadth of Four Rods from the now dwelling house of John Horne thro' Bloomendale District or Division to the now Dwelling house of Adrian Hoogelandt;" and it would appear that this road was treated both by the commissioners appointed by the act of 1703 in their report and by the Colonial Legislature by the act of 1751, as a road laid out and established under the act of 1703. In the patent of Governor Nicholas van Burgh and others, dated October 3, 1667, and in the deed from Webbers to Balme, dated November 2, 1713, which conveys tracts of land through which this road runs, no

* The opinion of the referee will be found at page 608.

mention is made of it as an existing road; and the same may also be said of the deed from Balme to Hoppe, dated August 13, 1714. And while this negative evidence is of slight force, as undoubtedly the road was in use prior to 1713, the date of the earlier of the two deeds above mentioned, it tends to confirm the statement in the act of 1751 that this road was actually laid out by the commissioners under the act of 1703. Judge Hoffman, in his treatise on the Estates and Rights of the Corporation of the City of New York, treats Bloomingdale road as laid out by the commissioners under the act of 1703; and the survey that was made and filed on the 16th day of June, 1707, by the commissioners under that act is printed in the appendix to the Estates and Rights of the Corporation of the City of New York by Judge Hoffman. (Vol. 2, p. 250.)

There is nothing to overcome the presumption that an open road existing in a country subject to the rules of the common law is a road in which the fee is vested in the adjoining owners, the public having an easement. This presumption is stated in *Dunham* v. *Williams* (37 N. Y. 251) to be that the road "was originally taken from the adjoining owners and for the sole purpose of being used as a thoroughfare."

A piece of land which includes the premises in question through which the Bloomingdale road runs was, in 1714, conveyed to Matthias Hopper, and subsequently became vested in John Hopper, who, on the 12th of October, 1778, made his last will and testament by which it was devised to his children and grandchildren, and on February 4, 1782, the devisees entered into a partition agreement by which this property was divided. Lot No. 6 on the west and lot No. 6 on the east side of Bloomingdale road, which included the premises in question, were set apart to John Hopper, the younger, and this partition was ratified by a conveyance from the other tenants in common. We think by this partition John Hopper, the younger, became seized in fee of the land on both sides of Bloomingdale road, including the fee of the road subject to the public easement. He made his will on the 13th day of September, 1815. He left surviving him his widow and three grandchildren, the children of a deceased daughter, Mary Striker. This will has been the subject of much litigation, but was finally construed by the Court of Appeals in *Striker* v. *Mott* (28 N. Y. 82) as creating a

trust to continue during the life of his three grandchildren, with a vested remainder in their heirs.

Of the grandchildren of John Hopper, the youngest, Ann Striker, died April 17, 1860, without issue. Winifred Mott died March 16, 1862, leaving issue, and Garrit H. Striker died April 15, 1868, leaving two sons (James A. Striker, who died in 1900 without issue, and Ambrose K. Striker, who died March 16, 1883, intestate, without issue) and two grandchildren, Elsworth J. Striker, still living, and Joseph M. L. Striker, who died without issue June 13, 1883. The descendants of Garrit H. Striker would, therefore, be entitled to one undivided half of the property of John Hopper, the younger, and the descendants of Winifred Mott to the other undivided half. The fee of Bloomingdale road passed under this will to his three grandchildren and their heirs, subject to the trust, the premises in dispute, being a portion of Bloomingdale road as it existed at the time of the death of John Hopper, the younger. Winifred Mott, one of the devisees of John Hopper, the younger, died on March 16, 1862, leaving her surviving four sons, Garrit Striker Mott, who died in 1869, unmarried and without issue; Jordan Mott, who died February 20, 1874, unmarried and without issue, and Matavus Hopper Mott, who died in 1864, leaving two sons, the plaintiffs, Hopper S. Mott and Alexander H. Mott, as his heirs, and his widow, the plaintiff, Ruth Ann Wallace; and the plaintiffs claim title to the property as the heirs at law of Winifred Mott, one of the grandchildren of John Hopper, the younger. The plaintiffs' right to recover, therefore, depends upon their proving that the share of Winifred Mott, a devisee of John Hopper, the younger, in the bed of Bloomingdale road, vested in their ancestor, to which as her heirs at law they are entitled to an interest.

The very thorough discussion of the various questions presented by the learned referee, with whom in the main we concur, renders it unnecessary for us to do more than state our conclusions upon the objections taken by the learned counsel for the defendant appellant upon which he seeks to reverse the judgment. The first point is that Bloomingdale road in front of these premises was opened as a road during the time that this city was in the occupation of the Dutch government, and that, therefore, the fee of this road was vested in that government, and upon the conquest of New Netherlands by the

English the fee of that road vested in the English crown and was transferred by the early charters to the city of New York. But, as we have said, we can find no evidence to show that this road was a public highway prior to the transfer of the colony of New York to the British government, and the ordinary presumption applies that the fee of a road opened under the English common law remained in the former owners of the property, the public acquiring a mere easement.

We are also satisfied, in answer to the defendant's second objection, that by the partition agreement between the devisees of John Hopper, the elder, John Hopper, the younger, became vested with the fee of the road adjacent to lot No. 6, which, by the partition agreement, was assigned to him as his share of the property.

The defendant also claims that the fee of the land was taken for the widening of Bloomingdale road under chapter 61 of the Laws of 1787, and that the plaintiff cannot, therefore, recover for the portion of Bloomingdale road that was acquired under the provisions of that act. The question as to what interest would vest in the city or in the public, if a proceeding had been instituted under that act, the value of the land taken ascertained under it and the amount thus ascertained paid to the owner, is not free from doubt. It is not necessary, however, that that question should be determined, as there is no evidence that any such proceeding was instituted or any such award made or paid to the owners of the land necessary for the widening of Bloomingdale road. The only evidence we have is that in 1782, when the property of John Hopper, the elder, was apportioned among his devisees, a map filed for that partition showed Bloomingdale road to be two rods wide, while by the Dougherty map, made in 1820, showing the division of the property among the heirs of John Hopper, the younger, the Bloomingdale road appears to be four rods in width. Certain proceedings of the common council are referred to by which Bloomingdale road was ordered to be widened to its full width of four rods, and that a committee of the common council was appointed to open the road and to confer with the proprietors of land on the subject, but there is. no evidence that any proceedings were taken under this resolution or that any award was made to the owners of the property taken to widen the road, and in *Blackman* v. *Riley* (138 N. Y. 318), in

speaking of these resolutions of the common council, the court said: "The mere resolutions of the common council do not prove the fact that proceedings had been taken to acquire the title to lands which might be necessary for the purpose of widening a road. And if such proof had been given we do not think it can be assumed, in the absence of evidence, that the committee appointed by the common council to see that the abutting owners moved their fences back, performed that duty or exercised that power. * * * We cannot, in such case, presume action of which there is not the slightest evidence." We can find, therefore, no evidence to show that the city of New York ever acquired the title to the fee of any portion of Bloomingdale road as shown to exist in the year 1820 of a width of four rods, and the presumption that in such a road the public had an easement and the fee remained in the abutting own- ers must control.

The next point insisted upon by the defendant is that under chapter 203 of the Laws of 1847 the city acquired the fee of Bloomingdale road. I do not agree with the referee that there was no evidence to show that the report of the commissioners in this proceeding was confirmed by the Supreme Court. On the con- trary, I think the evidence quite conclusive that the report was confirmed and that both the city and the property owners acted upon such confirmation. The evidence that upon the back of the report there was an indorsement signed by the clerk of the Supreme Court that the report was confirmed by the court was in itself evidence of the action of the court confirming the report, and this, I think, would be sufficient, even without a formal order of confirmation; and the publication of the confirmation of the report and the action of the city and the property owners, both in imposing an asssess- ment for the cost of the proceedings by the city and the payment of awards by the city based upon such confirmation, was sufficient to require a finding that the report had been confirmed. Nor am I inclined to agree with the referee that the publication of the notice of the appointment of commissioners of estimate and appraisal and the publication of the notice given by such commissioners appointed in said proceeding was not sufficient to give the court jurisdiction. I think it clear, however, that the city acquired no title to the fee of Bloomingdale road, for the reason that the report of the commis-

sioners specifying the property taken in the proceeding for which an award was made does not specify the fee of the street as a portion of the property taken nor was any award made for the fee of the street to the owners of the fee.

The act under which this question is presented is chapter 203 of the Laws of 1847. It is entitled "An Act to lay out a new street in the twelfth ward of the city of New York, and to keep open a part of the Bloomingdale road in said city." Section 1 of the act provides that "All that certain piece or parcel of land situate, lying and being in the twelfth ward of the city of New-York and bounded and described as follows, that is to say:" Then follows a description of a strip of land which includes the Bloomingdale road as then existing; and the section then continues, "is hereby declared for all legal purposes to be one of the streets of the said city in like manner as if the same had been so laid out by the commissioners appointed in and by the act" passed April 3, 1807 (Chap. 115).

After the passage of this act a resolution was passed by the common council to open this road, and, upon the petition of the city, the Supreme Court appointed commissioners of estimate and assessment. In that petition it is alleged that the common council "have deemed it advisable for the public convenience to open the Bloomingdale Road from the Seventh Avenue to the Tenth Avenue in the Twelfth Ward of the said City, the said Bloomingdale Road being a Street in that part of the said City laid out into streets, Avenues, Squares or public places by the Commissioners of Streets and roads under and by virtue of an act of the Legislature of the People of the State of New York, entitled 'An Act relative to improvements touching the laying out of Streets and roads in the City of New York and for other purposes,' passed April 3, A. D. 1807, by taking for that purpose the lands and premises hereinafter described and removing therefrom the buildings situate and being thereupon, which said lands and premises are situated and bounded as follows, that is to say." Then follows a description of the property as specifically described in the act of 1847. The petition further states that the petitioners "have accordingly ordered the said Bloomingdale Road to be opened in manner aforesaid;" and asks that in accordance with chapter 86 of the Revised Laws of 1813 (see § 177 *et seq.*, as amd.) three commissioners of estimate and assess-

ment be appointed for the purpose of performing the duties relative to the premises described in and by the said act mentioned.

On June 1, 1847, an order was entered appointing three commissioners in accordance with the prayer of this petition, and these commissioners filed their report on March 31, 1849. This report specifically describes by metes and bounds 122 parcels of land as the property to be taken for public use and for which awards are made, and there is annexed to this report a map which describes the property taken for the improvement. Upon this map Bloomingdale road is laid out as an existing road. Parcel 27, for which an award was made, is a strip of land extending from Fifty-second street to within a short distance of Fifty-third street, one foot three inches in width on Fifty-second street and five feet in width upon the northerly side of the strip, which is described in the report as "Commencing at the point of intersection of the northerly line of 52nd street and the easterly line of the present Bloomingdale Road as the same is now opened and used and running thence easterly along the said northerly line of 52nd street one foot and three inches to the easterly line of the Bloomingdale Road as the same is to be opened; thence northerly along the said easterly line of the Bloomingdale Road as the same is to be opened, one hundred and seventy-two feet and two inches to land of Isaac Fitz and John Johnson; thence westerly along the said last-mentioned land Five feet to the easterly line of the present Bloomingdale Road as now opened and used, and thence southerly along the said easterly line of Bloomingdale Road aforesaid one hundred and seventy-three feet and six inches to the point or place of beginning;" and the commissioners further reported that Edward Sandford, trustee of John Hopper, deceased, "is seized in fee of, in and to the last above described piece or parcel of land," and the commissioners awarded to Edward Sandford, as the owner of the said piece of land as described, the sum of $206. A similar piece of land is described on the westerly side of the present Bloomingdale road between Fifty-second and Fifty-third streets by a description substantially the same in relation to the road, and for which an award of $584 was made. The report makes no mention of the ownership of the fee of Bloomingdale road and makes no award for the rights of the owners of the fee. I think that by this proceeding the public neither attempted to con-

demn the interests of the owners of the fee of the bed of the street, nor acquired title of such fee, and that, therefore, the devisees of John Hopper were not divested of their property in the road by the proceeding.

Section 6 of article 1 of the Constitution of 1846 provided that no person shall be deprived of life, liberty or property without due process of law, nor shall private property be taken for public use without just compensation. The devisees of John Hopper, the younger, owned the fee of this street, subject to an easement in favor of the People of the State. This fee was protected by this provision of the Constitution, and neither the State nor the municipal corporation could take that property for public use without paying therefor. The report of the commissioners evidently assumed that the right of the city or the public to use this road was as it then existed sufficient for the purpose of carrying out the order of the common council opening this road, and no attempt was, therefore, made to acquire the fee. The commissioners did not assume to estimate the value of the fee owned by the devisees of John Hopper, the younger, and made no award for its value, and the final confirmation of that report did not divest the owners of this property of their interest therein.

Nor do I think that there was any adjudication in this proceeding that the city owned the fee, assuming that the proceedings were regular and the owners of the fee were before the court. There was no such adjudication in the report or in the order confirming it. There is nothing that determines that the city owned the fee. There already existed a public easement to which the fee was subject, and whether the commissioners assumed that that easement was sufficient to carry out the purpose of the act and the object of the city in opening the street, or assumed that the fee of this street then vested in the city, is entirely immaterial. If, as a matter of fact, these plaintiffs owned an interest in the fee of the street, they could not be divested thereof, except upon payment to them of its value.

When this report was presented to the court and it was seen that the commissioners had made no attempt to determine the value of this property, the owners of the fee of the road had no reason to appear and object to that report as their property in the street was not affected. Whatever they had before the proceeding was com-

menced they still had after the confirmation of the report, and their ownership of this property was, therefore, unaffected by the proceeding. If the commissioners had determined that the interest of the owners of the fee of this road, subject to the easement, was of merely nominal value, and had made a nominal award, and their report had been confirmed, then of course there would have been an adjudication as to the value of the interest of the owners of the fee which would have been binding upon the owners, and the fee would thereupon have vested in the city of New York. But in the absence of such a determination by the commissioners, by which the value of the interest of the plaintiffs or their predecessors in title in the specific property was ascertained and an award made therefor, I can find no authority for saying that there was an adjudication that no one except the public had an interest in that property. If a proceeding was commenced to condemn a block of land for public use, and the commissioners left out of their report any reference to one specific lot included in that block, I do not imagine that it could be claimed that the confirmation of such a report was an adjudication that that particular lot was worth nothing, or that the city could get a title to it without paying its value. Before the property can be acquired by the city it must pay its value, to be ascertained by the report of commissioners or the verdict of a jury. The pieces of property for which awards were made were bounded by the side of the existing road and not by the road itself, so that by no construction can it be claimed that the award made for these abutting pieces of property did include the right of the abutting owner to the road itself. Nor was the payment of the award to the trustee the payment of an award made for the fee of the street; and thus the receipt by Edward Sandford, the trustee, assuming that a payment to him would have divested the plaintiff of the fee of the street, if an award had been made for that fee, does not estop these plaintiffs from insisting that the award that was made and received was an award for the property abutting on the street which was taken for the opening of the street.

The next point relied upon by the defendant is that " Whatever may have been the actual legal effect of the proceedings taken in 1847 for the opening of Broadway, the City of New York has been in possession ever since, under those proceedings, claiming that the

street had been regularly opened under the Act of 1813, and that it was entitled to a fee therein." This position seems to be based upon the fact that the city had acquired by adverse possession the fee of the street; but there is not the slightest evidence that the claim of the city in the street, down to the time that the street was closed and the defendant's predecessors in title took possession of the property, was adverse to the plaintiff. It is conceded that there was an easement to which the fee of the Bloomingdale road was subject, and the possession of the public continued after the proceedings, based upon the act of 1847, as it had before existed. There is nothing to show that the city or the public claimed any other or greater right in this street after the confirmation of the proceedings taken under the act of 1847 than had before been exercised for many years.

The next objection taken by the defendant is that by the actual partition made in pursuance of a judgment of the Supreme Court, entered in an action for that purpose on the 10th day of January, 1865, the right of the plaintiffs to the fee of the road was divested.

After the death of John Hopper, the younger, in the year 1820, a proceeding was commenced in the Court of Common Pleas of the city of New York, called the Mayor's Court, asking for a partition of the property, the petitioner in that proceeding being Ann Striker, one of the grandchildren of John Hopper, the younger, and the defendants being the other grandchildren, the parties being the devisees of this property in question named in his will. Commissioners to partition the property were duly appointed and it was determined that the rights of the parties "are as in the said petition set forth, and that partition be made." And the commissioners "did set apart, allow and assign unto the said Ann Striker, the said plaintiff or petitioner, in severalty, for her part and share of the said premises, according to her right therein, as the same is ascertained and determined by the said Court, all and singular the several lots, pieces or parcels of land and premises, with the appurtenances thereto," and then follows a particular description of the property set apart to Ann Striker. One of the pieces of property thus set apart to Ann Striker began at a point on Bloomingdale road and land belonging to Cornelius Har-

sen, and running thence by metes and bounds back to the Bloomingdale road, and thence along the said Bloomingdale road 201 feet to the place of beginning, a description which would clearly include the fee of one-half of the Bloomingdale road upon which this piece of land abutted, and this partition, if carried out, would have vested Ann Striker with the fee of Bloomingdale road which includes the premises in question. On the 15th of February, 1823, this report of the commissioners was confirmed by a final judgment. Annexed to this judgment was a map which was introduced in evidence, showing the property set off to Ann Striker by this judgment.

If this decree in partition had been valid, there can be no doubt but that Ann Striker would have acquired the fee of that portion of Bloomingdale road the title to which is included in the present action. And in April, 1821, the parties to the said action executed to each other releases of the shares or portions allotted to each in severalty. Under this decree of the Mayor's Court, the grandchildren entered into possession of the portions set apart to them in severalty until their death. Ann Striker died without issue in 1860, whereupon an action of ejectment was commenced in the Court of Common Pleas in the city of New York to recover a portion of the real estate of John Hopper, the younger, the plaintiff claiming that he had acquired title to that portion of the property by virtue of a deed from the sheriff executed on a sale under execution and a judgment entered against Garrit H. Striker, one of the devisees under the will of John Hopper, the younger. That case came before the Court of Appeals in *Brewster* v. *Striker* (2 N. Y. 19). It was there held that by the will of John Hopper, the younger, the devise over was to the surviving grandchildren or grandchild on the death of those who should die without lawful issue then living; "that the limitation over was valid as an executory devise; and that as the three grandchildren were still living, Striker, under whom the plaintiff claimed, had no vested estate in remainder or future estate in any part of the premises which could be sold under the judgment against him, or which could pass by a sheriff's deed to the purchaser;" that the executors took by implication the present legal estate in the premises as trustees and that the grandchildren of the testator took

no immediate legal estate which could pass by sale under the judgment; that the partition proceeding in the Court of Common Pleas was ineffectual to vest any legal title in either of the parties to the action, as the legal title vested in the trustees under the will.

Subsequent to this decision an action was commenced in which it was claimed that on the death of Ann Striker without issue, the third part of the Hopper estate became vested in the surviving grandchildren of John Hopper, the younger, in fee simple by virtue of the limitation over in the Hopper will. The executors and devisees of Ann Striker brought a cross action claiming that they took under the will a fee simple. The trustee brought another action to establish the trust of the Hopper will, he insisting that by a proper construction of Hopper's will the executors took a trust in all the shares until the death of the last survivor of the three grandchildren. These actions came before the Court of Appeals in *Striker* v. *Mott* (28 N. Y. 82). Denio, Ch. J., in delivering the opinion of the court, states the question to be "whether Ann Striker was seised, at the time of her death, of an estate of inheritance in the premises in controversy." He then calls attention to the terms of the Hopper will and to the partition action commenced in the Mayor's Court of the city of New York in October, 1820, the decree in that action, and the partition deeds executed between the respective parties allotted in severalty to each of the devisees, and states that the Supreme Court had decided that Ann Striker had no estate in the premises of which John Hopper had died seized in her lifetime, and that as to the judgment in partition and the partition deeds, their only effect was to adjust the share of the rents and profits to which the devisees would respectively be entitled during their lifetime; and that if, by their terms and legal effect, they would take a greater interest under the judgment and deeds, they ought to be deemed void in equity and be vacated and annulled accordingly. The court then referred to the decision of the Court of Appeals in *Brewster* v. *Striker* (*supra*) as holding that the grandchildren took no immediate legal estate, the executors of John Hopper taking such an estate as trustees by implication. It was also held that the estate of the executors or trustees ceased upon the death of Ann Striker as to the one-third of the estate devised for her benefit; that the judgment in partition and the deeds executed between

the devisees of Hopper, to carry that partition into effect, conveyed no present title or interest in the estate; that the executors were seized of an estate for life and were entitled in equity to the rents and profits; that the deeds could not have any effect by way of release because the grantors had no estate which it could operate to enlarge; and the chief judge concluded: "Taking this will altogether, I understand the successive estates in each third part of the land to be limited as follows: *First*, to the trustees for the life of the grandchild for whose benefit that third was devised, remainder to the issue of that grandchild, if he or she shall have issue, in fee; but if he or she shall die without issue living at his or her death (which last qualification results from the subsequent limitation to the survivor of the grandchildren), then remainder to the grandchildren and the survivor of them. *Second*. This second remainder is contingent, though it would have been vested if the first remainder had been for any estate less than a fee simple. * * * Hence Garrit H. Striker and Mrs. Mott had no estate which they could convey to Ann Striker by the deed under consideration, and hence, also the devisees of the latter took nothing by the devise formally made in their favor."

Applying the principles established by these decisions, upon the death of Ann Striker without issue, the surviving grandchildren became vested in fee simple with the undivided third of the property that had been held for Ann Striker during her life. Whereupon an action was brought in the Supreme Court for a partition of the property of John Hopper, the younger. The premises abutting upon the portion of Bloomingdale road in question were described as beginning at the corner formed by the intersection of the northerly line of Fifty-second street with the easterly line of Broadway; thence northerly along the said easterly line of Broadway one hundred and seventy-seven feet and nine inches to the land of several owners; thence in a southeasterly direction along said land of several owners to the westerly line of Seventh avenue; thence southerly along the westerly line of Seventh avenue to the northerly side of Fifty-second street; thence westerly along the northerly line of Fifty-second street ninety-six feet and three inches to the point or place of beginning; "Together with all the right, interest, claim and demand whatsoever present or prospective

vested or contingent of the owners of such last mentioned tract, piece or parcel of land in the streets and avenues adjoining the same by reason of the beds of such streets and avenues or any part thereof having been taken pursuant to the statutes in that behalf made and provided from such owners to form such streets and avenues." And the property upon the westerly side of Broadway opposite the premises described as set forth in the complaint was also described with a similar provision. The complaint contained the further provision that " the said plaintiff further shows that on the twenty-eighth day of November, one thousand eight hundred and twenty, a petition was presented by said Ann Striker, one of the devisees of the said will of said John Hopper, to the Court of Common Pleas for the City and County of New York, called the Mayor's Court, praying for a partition of certain portions of the real estate devised in and by such will, and setting forth among other things that she, the said Ann Striker, was tenant in common of an equal undivided third part of the premises named in said petition which were the same lands, tenements and hereditaments hereinbefore described;" that such proceedings were afterwards had upon such petition that commissioners were appointed to make partition of said premises, and did make such partition; that the said proceeding for partition in said Court of Common Pleas and certain mutual simultaneously executed deeds of release thereupon executed between the said parties in interest, purport to allot and set off in severalty unto the said plaintiff, Garrit H. Striker, a certain portion of the said lands, tenements and hereditaments described, and also to set off and allot in severalty to the defendant Winifred Mott another portion of the same, and unto the said Ann Striker, then deceased, another portion of the same; and that in any partition of the said lands, tenements and hereditaments described and so devised by said John Hopper, which may be adjudged or made in this action, it will be found convenient and agreeable to equity that the respective shares to be allotted and set off in severalty to the said Garrit H. Striker and the said Winifred Mott respectively shall be taken from that portion of the same lands, tenements and hereditaments described and so devised as aforesaid which were so set apart in severalty as aforesaid to said Ann Striker in the said former partition.

To this complaint there was no answer, and judgment in partition was entered on the 31st day of March, 1864. This judgment directs that partition be made of the lands and premises of which partition is demanded, so that the several parties whose proportionate shares in the whole are mentioned shall have and hold in severalty such parts and portions of the said lands and premises as shall be allotted and assigned to them respectively on such partition. These commissioners made their report on December 31, 1864, which recited that they had caused an accurate map to be made and had filed the same in the office of the register; that upon the said map these large parcels or blocks were divided into city lots with reference to the established streets of the city, and actual partitions of the property were made with reference to this map, a copy of which map was introduced in evidence. The lots on the east side of Broadway, between Fifty-second and Fifty-third streets, were designated by the numbers 76 to 82 on the map, and those on the west side, between Fifty-second and Fifty-third streets, by the numbers 83 to 89 on the map. The commissioners further reported that they had ascertained whether they might consistently, " with the rights of the parties and with justice and equity, make the partition of the said lands and premises conform to the respective occupations in severalty of one equal third part thereof enjoyed by the said Garrit H. Striker and by the said Ann Striker and by the said Winifred Mott respectively, and we did, therefore, accordingly divide the whole premises into three principal divisions, one thereof being identical with the portion so occupied in severalty by the said Ann Striker, deceased, in her lifetime, and one other division being identical with that portion so occupied in severalty by the said Winifred Mott, deceased, in her lifetime, and the said remaining division being identical with the portion so in the occupation in severalty of the said Garrit H. Striker." The commissioners then allotted to the said Garrit S. Mott, as one of the children of Winifred Mott, lots 79, 80, 81, 82 on the easterly side of Broadway, and 86, 87, 88, 89 and 172 on the westerly side of Broadway, the lots on the easterly side of Broadway being described as follows: " Also those four lots, pieces or parcels of ground situated in said 22nd Ward of the City of New York, designated on said map by Nos. 79, 80, 81 and 82, and together described and bounded as follows: Beginning at a point in the east-

erly side of Broadway distant 29 feet and 7 inches southwardly from the southerly side of 53rd Street, and running thence southwardly along said easterly side of Broadway 99 feet 10½ inches, thence eastwardly on a line parallel with said 53rd Street 115 feet 6½ inches to the west side of 7th Avenue, thence northwardly along said westerly side of 7th Avenue 77 feet and 5 inches to land of several owners, and thence northwestwardly along said lands of several owners 141 feet 6⅞ inches to said easterly side of Broadway at the place of beginning." This report was confirmed by a decree entered on the 10th day of January, 1865, by which it was adjudged and decreed " that the said hereinbefore described part or allotment of the said lands and premises allotted and assigned as aforesaid by the said commissioners to the said defendant Garrit Striker Mott as the part or share of the said lands and premises constituting his share of the said land and premises shall be and the same is hereby vested in him, the said Garrit Striker Mott, in severalty to be had, held and enjoyed by him, his heirs and assigns forever separate and apart from the other parts of the said lands and premises."

I am inclined to think that under this decree the fee of the Bloomingdale road was included with the abutting property. The partition proceeding in the Court of Common Pleas was based upon a construction of the will by which the land devised by John Hopper, the younger, was vested absolutely in his grandchildren, and in that proceeding there was set apart to each of the grandchildren a certain portion of the property in fee. The effect of that proceeding, if the construction of the will had been correct, would have vested in each of the grandchildren the fee of one-half of Bloomingdale road upon which the property assigned abutted. That partition suit having been based upon an incorrect construction of the will, and the effect of that partition being merely to assign the particular portions of the real property to which each grandchild was entitled during his life, the issue of the grandchildren having a vested remainder in their parents' share of the estate, one of the grandchildren having died, this partition suit was commenced in 1865 to have a final partition of the estate, and in the complaint it was asked that the several parts that had been set apart to each grandchild under the decree of partition in the Court of Common Pleas in the year 1820 should be set apart as the property to which the descendants

of the grandchild should be entitled; and the interest in the abutting streets was described as a part of the property that had been set apart to the grandchildren and of which partition was asked. The interlocutory judgment directed the commissioners appointed to make partition of the lands and premises of which partition is demanded, as follows : " And in respect of the several portions of said lands and premises so occupied in severalty by the said Winifred Mott and Garrit H. Striker respectively, it is declared, decreed and adjudged to be just and equitable that as far as may be found consistent with the rights of other parties the partition hereinafter directed should be made to conform to such occupation in severalty to the end that there may be allotted and assigned to the issue of said Winifred Mott and the assigns, if any, of such issue or of any of them for that equal third part of the said lands and premises which so as aforesaid came to said sons of said Winifred Mott by the said devises to them respectively contained in the will of the said John Hopper the portion so occupied by the said Winifred Mott or so much thereof as may be and so that there may be allotted and assigned to the trustee under the said will for his equal third part of the said lands and premises under said John Hopper's will the portion so occupied by the said Garrit H. Striker or so much thereof as may be."  In pursuance of this direction in the decree the commissioners reported that they had divided the whole premises, which included the interest in the street, into three divisions, one thereof being identical with the portion so occupied in severalty by the said Ann Striker, deceased, in her lifetime, and had allotted the portions so occupied by Winifred Mott, deceased, in her lifetime to her children.  The particular portions allotted to each child were then described by the map and also by a particular description.

If the property had been awarded by simple reference to the map it would have carried with it one-half of the Bloomingdale road upon which these lots abutted : and if there had been no reference to the map, and the property that had been awarded was to be ascertained solely from the description, the fee of the Bloomingdale road would have been excluded.  The question then comes down to one of intention.  Considering the situation, that the action was brought to partition all of the property in which these tenants in common were interested, that the complaint described the interest

in the fee of the street as well as the abutting property that was to be partitioned, that the commissioners were directed to partition the property of which partition was demanded, so far as could be to carry out the partition of 1820, which partition would have vested in the abutting owners the fee of the streets, and that the commissioners reported that they had complied with this direction, and to carry that out allotted these specific lots to Garrit S. Mott, I think we can find here an intention to include in the award of these lots one-half of the Bloomingdale road upon which the lots abutted. But when Garrit S. Mott came to convey this property he adopted a description of the property that he then conveyed, which excluded the fee of the street. It is true that the deed also referred as a part of the description to the number of lots upon the map upon which the division in the partition suit was made; but assuming that we could find from the existing situation at the time of the partition suit, and the object for which the partition suit was brought, an intention to vest in Garrit S. Mott the fee of the street, there is nothing to show that when he subsequently conveyed these lots to Dudley Field in March, 1865, he intended to include the fee of the street; and as the plaintiffs are the successors in title of Garrit S. Mott, they would be entitled to at least the judgment that has been granted in this action.

In *Potter* v. *Boyce* (73 App. Div. 383; affd., 176 N. Y. 551) we based a conclusion that it was intended to include the fee of the street in a partition of property between tenants in common upon the intention of the parties to be ascertained from the existing conditions, although the description, standing alone, without such evidence of intention, would be insufficient to convey the street. Applying that rule, it might be that upon the division of this property in the partition action, such an intention could be ascertained and carried into effect; but, as before stated, there is nothing to show that when Garrit S. Mott undertook to convey to Field he intended to convey the fee of the street, when he adopted a description which by itself would exclude the fee. I do not think that a mere reference to the map is sufficient to show that the description which in express terms excluded any interest in the street was intended to include the street; and while the fact that the property was sold by a reference to the map would justify evidence of inten-

tion to include the interest in the street and justify a finding, if such intention was established, that the fee of the street was included, I do not see, in the absence of evidence to show that such was the intention, that the court is justified in construing the grant to include the street when the description of the property by metes and bounds expressly excludes it. Assuming, therefore, that we would be justified in holding that this judgment in partition actually did vest the fee of the street in Garrit S. Mott, there is nothing to show that he intended to transfer it to Field, through whom the defendant claims title.

There is one other point relied upon by the defendant, based upon chapter 890 of the Laws of 1869, relative to the widening of Broadway between Thirty-fourth and Fifty-ninth streets, which, the defendant claims, in some way divested the owners of the fee in the Bloomingdale road and vested it in him. This claim is based upon a provision of section 2 of the act that " if any part or parts of Broadway shall be closed under the provisions of this act, any owner of land now fronting on Broadway, abutting on any part so closed, may acquire an exclusive right, title and interest of, in and to so much of any part so closed as lies between the present front line of the land owned by him and the line of Broadway as it may be so as aforesaid located and established * * * upon paying to the chamberlain of the city of New York, for the mayor, aldermen and commonalty of the said city, the amount of any award by the said commissioners of estimate and assessment, for the discontinuance of the public use of the land such owner is so entitled to acquire, and also paying to the said chamberlain, for the parties entitled thereto, the amount of any award by the said commissioners for the reversionary interest in such lands, or any part thereof ; * * * but no award shall be made for the reversionary interest, in case the parties having such interest shall be entitled to acquire the land." It seems unnecessary to consider this provision as having the effect of divesting these plaintiffs of their interest in this property and transferring it to another without their consent. Whatever right the city of New York acquired by this statute to condemn property for public use, it certainly could acquire no right to condemn property for the private use of the owners of adjacent property. Neither the Legislature nor the city could divest the plaintiffs of their property in

this street for any but a public use. These plaintiffs at the time of the passage of this act were the owners of the fee of a portion of Bloomingdale road, subject to a public easement, and when the public discontinued its use of the land constituting the road, the land belonged to the plaintiffs, discharged from the public easement to which it had before been subject.

I have now, as concisely as I could, stated the views that have forced me to the conclusion that the plaintiffs are, and the defendant is not, the owners of the fee of this strip of land forming a part of Bloomingdale road, and the plaintiffs were, therefore, entitled to a judgment awarding them the possession of the property.

Upon the plaintiffs' appeal from the judgment little need be said. The plaintiffs' predecessor in title granted to the defendant's predecessor in title this property abutting upon Bloomingdale road as an existing road. The plaintiffs' predecessor in title being the owner of the fee of Bloomingdale road upon which this property abutted, there followed from the grant to the defendant's predecessor in title a right, which was appurtenant to the land granted, to use the grantor's interest in the Bloomingdale road as a means of access to the property granted, and the plaintiffs' property in the road is clearly subject to that easement. When a person owning property abutting upon a road, whether public or private, conveys the abutting property to another, bounding it on the road, he subjects his interest in the road to an easement in favor of the property conveyed; and without citing the authorities that have established that proposition, it is sufficient to say that it is the settled law of this State. Neither the act of 1869 nor chapter 1006 of the Laws of 1895 could appropriate this property right vested in the plaintiffs and discharge the servient estate from the easement.

It follows that the judgment appealed from must be affirmed, but as both parties have appealed it should be without costs.

Van Brunt, P. J., and O'Brien, J., concurred; McLaughlin and Hatch, JJ., dissented.

Hatch, J. (dissenting):

I concur in the views expressed by Mr. Justice Ingraham in this case, save upon a single question, and as that is a controlling one in the case it necessarily involves a dissent from the conclusions

reached by the court. The facts which this case presents are involved to the last degree. They have been admirably stated by Mr. Justice INGRAHAM in his learned and exhaustive opinion and need not be further adverted to by me, except so far as it is necessary to express an opinion upon the particular question which is the subject of disagreement.

It is undisputed that the act of 1847 (Chap. 203) made provision for acquiring title to the lands therein specifically described by metes and bounds. Of the lands so described, Bloomingdale road formed a part. Pursuant to the provisions of this act, the city of New York instituted a proceeding to carry its terms into effect and vest in the city title in fee to the lands thus described. The petition which instituted the proceeding described such lands in the same terms as were contained in the act. Having particular reference to the Bloomingdale road, it stated : " The said Bloomingdale Road being a Street in that part of the said City laid out into streets, Avenues, Squares or public places by the Commissioners of Streets and roads under and by virtue of an act of the Legislature of the People of the State of New York, entitled ' An Act relative to improvements touching the laying out of Streets and roads in the City of New York and for other purposes,' passed April 3, A. D. 1807." It appears, therefore, that not only was the proceeding instituted for the purpose of acquiring title to all the lands described in the act and also in the petition, but that it was the clear and express claim made by the city in its petition that it had already acquired title to the land embraced within the Bloomingdale road ; and the authority was stated upon which it relied as the basis of the claim. By the provisions of the act of 1807 (Chap. 115) lands acquired by the city of New York thereunder for a public street vested in the municipality a title thereto in fee. It is evident, therefore, that by the terms of the petition notice of the claim of the city to be the owner of the fee of the land embraced within the Bloomingdale road was expressly given to property owners and persons interested therein. There is no doubt but that Sandford, as trustee of John Hopper, deceased, who is claimed to have been the owner at this time, not only of the strip of land which was taken upon the side of Bloomingdale road, but also of the fee to the street itself, had notice of this proceeding and of the claim thus made

upon the part of the city. He was made a party to this proceeding, a substantial award was made to him for lands taken outside of the limits of the Bloomingdale road, and the awards thus made were paid to and accepted by him. One of the issues, therefore, in that proceeding raised by the petition was the right and title of the city in and to the Bloomingdale road, and it was the issues thus raised which the commissioners subsequently appointed were called to pass upon and determine. As appears by the report made by the commissioners, they considered the subject of the ownership of Bloomingdale road, and, as I construe their report, made an adjudication with respect thereto. Their report is addressed to the Supreme Court; they recite therein that they are commissioners of estimate and assessment, duly appointed "relative to the opening of Bloomingdale Road from the Seventh Avenue to the Tenth Avenue in the Twelfth Ward of the said City, the said Bloomingdale Road being a street in that part of the said City laid out into streets avenues squares and public places by the Commissioners of Streets and Roads under and by virtue of the act of the Legislature of the people of the State of New York entitled 'An Act relative to improvements touching the laying out of streets and roads in the City of New York and for other purposes,' passed April 3, 1807." The report then recites the taking of the oath by each of the commissioners, and the filing of the same in the clerk's office of the city and county of New York, and then states: "And having viewed the lands and premises hereinafter mentioned and described do hereby report

"To this Honorable Court that said Bloomingdale Road is a Street in that part of the said City of New York laid out into streets avenues squares and public places by the Commissioners of streets and roads under and by virtue of the Act of the Legislature of the People of the State of New York entitled 'An Act relative to improvements touching the laying out of streets and roads in the City of New York and for other purposes,' passed the 3rd day of April in the year of our Lord 1807." Then follows a description of 123 parcels of land for which awards of damages are made, the form being the same in each case, differing only in the names of owners, boundaries and amounts.

It thus appears that, not only was the issue raised before the commissioners with respect to the fee of the Bloomingdale road, but

that they viewed the land and considered such question and reported upon such subject. With respect to this matter their report is an adjudication of that question, is complete in its terms and states the condition of the title, the force and effect of which is to determine that it belongs to the city of New York, as it was acquired by virtue of an act which vested title thereto in the city. That the commissioners made such adjudication is not only established by the determination as expressed in their report, but is clearly evident from all the other awards which they made. These awards were all for strips of land abutting upon the Bloomingdale road, and it would necessarily follow, if the commissioners made no adjudication as to the title in Bloomingdale road, that the proceeding which was confessedly instituted to take title to all these lands results in the acquirement of title by the city to the strips upon each side of the Bloomingdale road and leaves the fee of the road unaffected by the proceeding and the title still in the abutting owner. The result of such a proceeding is so manifestly inconclusive as to be absurd. It would be a theme for ridicule were it not so serious in its results. The existence of such a condition is so clearly at variance with the issues presented by the petition and the necessary understanding of the parties affected by the proceeding as to call for the rejection of such a construction of its effect, unless the adjudication be so faulty in its expression and determination as to admit of no other result. It is evident, however, that the commissioners themselves considered the issues thus presented, and they made in their report an intelligible adjudication upon the subject; for whatever else may be said of it, it is at least understandable. The intention was to dispose of the issues, and the language of the report leaves no doubt but that the commissioners assumed to determine that the city was vested with the fee of Bloomingdale road. Such adjudication having been made and being clear and intelligible and clearly within the issues they were required to determine, it became when confirmed a binding adjudication, having the force and effect of a judgment. It is so made by the express provisions of section 178 of chapter 86 of the Revised Laws of 1813, as well as of the act of 1807 and is supported by authority. (*Matter of Opening Eleventh Avenue*, 81 N. Y. 436; *Matter of Commissioners of Central Park*, 50 id. 493; *Spears* v. *Mayor*, 87 id. 359, and many other cases.)

I think that no distinction in principle can be made between *Matter of Opening Eleventh Avenue* (*supra*) and the present case. Therein the award which was made determined that the owners were only entitled to a nominal compensation, for the reason that such lands had been treated by the commissioners as dedicated to a public use. The court, on motion to confirm in that case, held that this conclusion of the commissioners was wrong, and, therefore, sent the case back to the commissioners to make a substantial award. Had the report making the award of nominal compensation been confirmed, it would have become a binding adjudication, even though it was in effect erroneous in failing to award substantial damages. Here, the report of the commissioners is an adjudication that the fee of the Bloomingdale road was in the city of New York, and that report was confirmed. It is, therefore, a binding adjudication, unless a single element calls for a different conclusion. In *Matter of Opening Eleventh Avenue* (*supra*) there was an award of a nominal sum made by the commissioners to the owners, and this is the only distinction in principle between that case and the present. The prevailing opinion in the present case reaches the conclusion that such distinction is vital, by reason of a constitutional prohibition (Const. [1846], art. 1, § 6), and that, therefore, the report and confirmation are without validity. We have no quarrel with the constitutional provision that land appropriated in proceedings *in invitum* for a public use cannot be taken without just compensation being made therefor, and proceedings seeking such result which fail to make an award where one is required are void. So far as I am aware, no such rule has been applied in a case where it appeared upon the face of the proceedings that such an award was not necessary, when a question of title only was involved. Compensation follows title. In the present case, the city of New York instituted proceedings to acquire title to lands; the commissioners adjudicated that the municipality was the owner in fee of a part of the lands thus sought to be acquired. Manifestly, under such an adjudication, the award of damages to abutting owners having no interest was not required; and as the city was the owner and taking the whole of the land required for the street, no award was necessary to be made to it. If the commissioners had awarded to the city of New York a nominal sum for the land in connection with their adjudication, upon confirmation the title

would have become absolute, even though the adjudication as to ownership was erroneous. That would not invalidate it, within the authority to which we have called attention. It would seem that the constitutional provision has no application to such a case. All that is necessary to protect the rights of every person is adjudication of title, the making of awards and payment. When lands of other owners are taken and paid for, the adjudication of its own title protects every right and is as conclusive as though an award of damages had been made. It is evident that the commissioners when they made their report adjudicated that this land belonged to the city of New York, but made no award therefor because no award was required to protect the rights of the city; and the court, when it confirmed this report and this adjudication of title, clearly had the right to consider that no award in such case was necessary, as the adjudication, together with the awards which were made for lands taken in the proceeding from other owners, operated to complete a proceeding by and through which all of the land embraced within the proposed street became vested in the city of New York.

It may be conceded that it is somewhat anomalous for a municipality to institute proceedings to condemn lands for a municipal purpose, which it owns at the time the proceeding is instituted. But in considering this subject, we are to bear in mind that the Bloomingdale road was at the time of the proceeding a public road and used as such for public travel. So far as appears there was no record in existence showing that in fact the title to this road had been acquired by the city by proceedings under the act of 1807, and yet the Legislature and the city were aware that such was the fact and in order to make a complete record of title embraced it within the act of 1847 and the proceeding, and thereby gave to all persons interested an opportunity to contest its claim if they had any valid right. It is also quite inferable that, as all of the land was to be acquired for a public street, it was deemed wise to embrace the road in order that any claimed easements or other interests might be considered and finally adjudicated. Under such conditions it is easily seen that prudence would suggest that the land thus proposed to be devoted to a public use should have no flaw in its title. This anomaly fails in the face of such conditions. The proceeding and adjudication rested upon intelligent foresight. There was an issue

FIRST DEPARTMENT, NOVEMBER, 1904. [Vol. 97.

and an adjudication of the city's rights, and such rights were intended to be established by an indisputable record.

Assuming that we are wrong in the above construction, when notices were given to the parties in interest of the confirmation of such report, and abutting owners were confronted with an adjudication that the city was the owner of the Bloomingdale road, they were required to make objection to such report and adjudication, or be bound thereby. No objections were made, and the party in whom it is now claimed that the title vested to this part of the Bloomingdale road affected by this action was a party to the proceeding and received awards for lands taken therein. As, therefore, this question was within the issue presented by the proceedings, and the commissioners considered and reported upon such subject, in which they adjudicated that the title was in the city, such adjudication as to all parties thereto was final and conclusive, and when confirmed it operated as a judgment declaring the fee of the Bloomingdale road to be in the city of New York. If we are right in this conclusion it is clear that the plaintiffs have no title or interest in these premises.

It follows that the judgment should be reversed and a new trial granted, with costs to the defendant appellant to abide the event.

McLAUGHLIN, J., concurred; VAN BRUNT, P. J., dissented.

Judgment affirmed, without costs.

The following is the opinion of the referee:

HAMILTON ODELL, Referee:

This is an action of ejectment. The allegation of the complaint is that the plaintiffs are "the owners in fee of an undivided interest in, and entitled to the possession of," a parcel of land on the easterly side of Broadway as at present located, between Fifty-second and Fifty-third streets, and "being a part of the portion of said Bloomingdale Road closed under the provisions" of chapter 890 of the Laws of 1869. The defendant admits that he is in possession of the premises, denies the plaintiffs' title, and alleges title, by conveyances and otherwise, in himself.

Proof has been made of a grant by Governor Nicolls in 1667 to Vanburgh and others of a tract of land north of the "Great Creeke or kill," and stretching from the Hudson river eastward 250 rods, and also of a deed by Aernout Webbers to John Balme in 1713, and a deed by John Balme to Matthias Hoppe (or Hopper) in 1714, all of which, it is claimed, include the premises in dispute; but how title got into Webbers or out of Hopper does not appear. John Hopper (the elder) was a son

of Matthias Hopper.   He died prior to July 19, 1779, leaving a will dated October
12, 1778, which was duly probated, and by which he devised to his five children and
his four grandchildren (the latter the children of his deceased son Wissell) all of
his lands "situate in the outward of the city of New York."   He directed that
the said lands be divided into six equal parts, and that a chart or map thereof be
made, and that the parts be distributed by lot among his said children and grand-
children, the latter to receive one share.   Jemima, one of the children, was the
wife of John Horne.   Mary, one of the grandchildren, was the wife of Lawrence
Allwye.   On February 4, 1782, a partition agreement was entered into by the
parties interested under the will, which was executed by John Horne in behalf
of his wife Jemima, and by Lawrence Allwye in behalf of his wife Mary, and
by Ann Hopper, "mother and guardian to Ann Hopper, John Hopper and
Nicholas Hopper," the other grandchildren, who were minors.   In *Blackman* v.
*Striker* (142 N. Y. 558) the court said: "The heirs of John Hopper the elder took
title in severalty to their respective allotments of his estate by force of the devise
to each contained in the will, the making of the map or chart directed by the
testator, the execution of the agreement for the partition or division directed by
the will, and the result of the drawing whereby each of the six shares were*
specifically described and located upon the farm."

The said partition agreement recited that John Hopper was possessed "of
lands and tenements situate in the outward of the city of New York adjoining.
the road called the Bloomingdale Road, running from the west side of said road
to the North River, and from the east side of said road to the Commons;" and
that the parties had agreed to lay out the farm on the west side of the road in
six equal lots, and on the east side of the road in six equal lots, and to "match"
each lot on the west side with a lot on the east side — "then to be drawn for in
the manner mentioned in said John Hopper's will."   In the lottery that followed,
lot 6 on the east side and lot 6 on the west side fell to the testator's son John;
and on February 15, 1782, the other parties in interest conveyed the said lots to
him — the deed containing substantially the same recitals as were contained in
the agreement, and describing the lots as on either side of the Bloomingdale road,
and defining their dimensions by chains and links, "as by a draft or chart thereof
made by Evert Bancker, Junr., may more fully appear, reference thereunto being
had."   According to the Bancker map the distance from the Hudson river to the
westerly side of the Bloomingdale road, along the northerly line of the Hopper
farm, was sixty chains and fifty links, and the distance from the westerly bound-
ary of the Commons to the easterly side of the road, along said northerly line,
was twenty chains and fifty links, and the width of the road was given as fifty
links.   Lot 6 on the east side was but two chains and fifty-five links in width and
was located directly opposite to the northerly part of lot 6 on the west side,
which was seven chains and fifty links in width.

The defendant contends that Bloomingdale road was opened by the Dutch
prior to the English occupancy of the island, and that the fee of the road was

* *Sic.*

vested in the Dutch government and passed to the English crown; that neither Matthias Hopper nor John Hopper, the elder, had any title to the roadbed; and that the heirs of the latter made no claim thereto, as shown by the recitals in the partition agreement and the deeds executed in pursuance or completion of that agreement, which expressly described the elder John Hopper's possessions as *adjoining* the road and running east and west from the sides thereof. The proofs do not warrant my finding, as a matter of fact, that the Bloomingdale road was a creation of the Dutch. They surrendered possession of the island to the English in 1664. The earliest record relating to the road to which my attention has been called is a report dated June 16, 1707, of commissioners appointed by an act of the Colonial Legislature, passed in 1703,* which directed them to lay out roads, etc. One of the roads laid out by the commissioners in the county of New York they describe as follows: "From the house at the end of New York Lane there is likewise to lye a road turning to the left-hand, the course being northerly and so by Great Kills and forward *as the said road now lyes*, unto Thennis Edis's and Capt. D'Keus, thro' the said Edis's land." There has been no location of either New York lane or Edis' or D'Kays' lands. But it has been assumed and correctly assumed, probably, that the road here referred to as existing in 1707 was a thoroughfare of some sort which extended from the city to a settlement at Bloomendael. Whether it was a public highway in the legal sense, opened by public authority or dedicated to public use, does not appear. The fact that it existed in 1707 does not warrant the presumption that it existed as a legal highway prior to 1664. In *Holloway* v. *Southmayd* (139 N. Y. 399) the court say the Bloomingdale road was opened as a public highway by the public authorities over the land of "Theunis Ides" in 1707. In his Treatise on the "Estates and Rights of the Corporation of the City of New York" (p. 385) Judge Hoffman says that it is apparent that no roads were opened through the county of New York without compensating the owners, unless they were laid out under the act of 1703 and its renewals; and that one of the roads so laid out was the "Bloomendale Road," which, according to a recital in an act passed November 25, 1751,* was four rods in breadth and ran "from the now dwelling house of John Horne thro' Bloomendale District or Division to the now Dwelling house of Adrian Hoogelandt."

The plaintiffs claim that, as John Hopper, the elder, owned the land on both sides of the Bloomingdale road, he was, *prima facie*, the owner of the fee of the roadbed also subject to the public use or easement. This claim is well supported by authority. (*Matter of John and Cherry Streets*, 19 Wend. 675; *Mott* v. *Mayor*, 2 Hilt. 363; *People* v. *Law*, 34 Barb. 501; *Wager* v. *Troy Union R. R. Co.*, 25 N. Y. 529.) The presumption is that "the ground was originally taken from the adjoining owners and for the sole purpose of being used as a thoroughfare." (*Dunham* v. *Williams*, 37 N. Y. 251; *Haberman* v. *Baker*, 128 id. 259.)

The partition deed by which lots 6 and 6 were granted and released to John Hopper, Jr., by the other heirs or devisees of John Hopper, Sr., describes the one as being on the east side, and the other as being on the west side of the Bloomingdale road, and respectively twenty chains and twenty chains and fifty links in depth. Did John Hopper, Jr., acquire title to the fee of the road in

---

* See p. 583, *ante.* — [REP.

front of the two lots? I think so. The presumption is that a conveyance of land bounded *by* an existing street carries the fee to the center of the street. (*Mott* v. *Mott*, 68 N. Y. 252; *Matter of Ladue*, 118 id. 219; *Haberman* v. *Baker*, 128 id. 257.) A grantor of land abutting on a highway may reserve the highway from his grant, but the presumption in every case is that the grantor did not intend to retain the highway, and such reservation will not be adjudged except when it clearly appears from the nature of the conveyance that it was intended. (*Kings County Fire Ins. Co.* v. *Stevens*, 87 N. Y. 291.) In *Lozier* v. *New York Central R. R. Co.* (42 Barb. 469) the court said: "If it is the intention of the grantor who conveys lots having streets along them to exclude the streets, his description must be clear and certain showing such intention." In that case the deed described the property as "village lots Nos. 11, 15, 17 and 19, on the north side of Green Street," and it was held that the grantee took to the center of the street. The same rule was applied in *Greer* v. *N. Y. C. & H. R. R. R. Co.* (37 Hun, 346) where the lots were described as situated on "the west side of North Market Street."

John Hopper, Jr., died in 1819, leaving him surviving his widow and three grandchildren, the children of his deceased daughter Mary Striker. He left a will dated September 10, 1815, by which he disposed of all his real estate. This will received a construction in *Striker* v. *Mott* (28 N. Y. 82). The plaintiffs are the descendants of the testator, and, as such, are entitled to undivided interests in the bed of the old Bloomingdale road lying between the said lots 6 and 6, and as it existed prior to 1847, unless the interests they might otherwise claim have been alienated or extinguished by grants or proceedings hereinafter referred to.

It may be mentioned here that, although the commissioners appointed under the act of 1703 laid out a road four rods in breadth, running northerly from the end of New York lane through the Bloomingdale district or division, the actual breadth of the road was but two rods at the time of the Hopper partition in 1784. This appears by the Bancker map, on which the road is represented as fifty links in width. The reduction in width seems to have been effected by proceedings authorized by and taken under the act of 1751 above referred to. (*Blackman* v. *Riley*, 138 N. Y. 327.)

In 1787 an act (Chap. 61) was passed entitled "An Act for the better regulating the public roads in the city and county of New York." The mayor, aldermen and commonalty were made commissioners "to regulate and keep in repair the present public roads or highways, and to lay out, regulate and keep in repair such other public roads or highways as shall hereafter be laid out in the said city and county." They were authorized and empowered to widen or alter all public roads and highways already laid out in said city and county to such convenient breadth, not exceeding four rods nor less than two rods, as they should judge fit to make them passable for horses and carriages. It was provided that if in widening or altering any such road or highway they should take or require for such purpose the lands of any person or persons, notice should be given to the owners; and that if the commissioners and owners should not agree as to the amount of compensation to be paid for the lands so taken, a jury should be summoned who should "inquire of and assess such damages and recompence as they shall, under all the circumstances, judge fit to

be awarded to the owner or owners of such land, according to their several and respective interests and estates * * * in the same;" and it was declared that the verdict of such jury and the judgment of the Mayor's Court thereon; and the payment or tender of the sum or sums so awarded to the owner or owners, should be binding "to all intents and purposes against the said owners and their respective heirs, executors, administrators and assigns, claiming any interest or title in or to the same land, and shall be a full authority to the said commissioners to cause the said land to be converted to, and used for the purposes aforesaid."

It is in evidence from the proceedings of the common council that on May 14, 1793, on the report of the committee on the Bloomingdale road, it was ordered "that the said road from its commencement at Horns house to Nicholas DePeyster barn be immediately opened to its proper & legal width of four rods," and Aldermen Furman and Campbell were appointed a committee "to attend to the opening of the said road." In September, 1797, a petition was presented to the common council praying for the opening of Bloomingdale road to its proper width of four rods, and it was "Ordered that Aldn Furman, Beekman & De la Montagnie be a committee to direct the proprietors of the land where the road is not of its proper width to remove their fences, & then to direct the Road Master to work & put the road in good order." When the road was actually widened has not been shown. It was prior to 1819, for it is not disputed, I believe, that by the Randel map made in that year, and by the Doughty map made in the year following, the width of the road is shown to have then been about sixty-six feet. The learned counsel for the defendant claims that there was no authority for the widening except the act of 1787 above referred to, and that, therefore, it must be presumed that the work was done under that act; and also that the act contemplated the taking by the city of the fee of any land required for the opening or widening of any road opened or widened under its provisions. There is no evidence that any proceedings whatever were taken under the act of 1787 for the widening of Bloomingdale road. Even if the presumption be as counsel contends, it is not important, as the courts seem to have decided adversely to his latter claim. (*Van Amringe* v. *Barnett*, 8 Bosw. 357, 372; *Deering* v. *Reilly*, 167 N. Y. 184, 191.)

On May 5, 1847, an act (Chap. 203) was passed entitled "An Act to lay out a new street in the twelfth ward of the city of New-York, and to keep open a part of the Bloomingdale road in said city." It affected a parcel of land described with great particularity, beginning at the southwesterly corner of the Seventh avenue and Forty-fifth street, and extending by various courses to the Tenth avenue and Seventy-first street, and thence by various courses to the place of beginning, and such land was declared "for all legal purposes to be one of the streets of the said city in like manner as if the same had been so laid out by the commissioners appointed in and by the act entitled 'An act relative to improvements touching the laying out of streets and roads in the city of New-York, and for other purposes,' passed April 3, 1807." It is, I believe, admitted that the Bloomingdale road as it existed in 1847 was wholly within the boundaries of the parcel of land referred to. At all events, between Fifty-second and Fifty-third streets the westerly boundary line of the said parcel was located

several feet to the west of the westerly line of the then existing road, and the easterly boundary line was located to the east of the easterly line of said road, at a distance from said easterly line of one foot and three inches at the northerly side of Fifty-second street, and of five feet and nine inches at the southerly side of Fifty-third street.

The common council proceeded promptly to lay out the new street. They resolved that "the Bloomingdale Road from the Seventh Avenue to the Tenth Avenue be opened according to law, and that the Counsel to the Corporation take the necessary measures for that purpose;" and on the 1st day of June, 1847, on the petition of the mayor, aldermen and commonalty, the Supreme Court, sitting at Albany, granted an order appointing three commissioners of estimate and assessment for the purpose of carrying the said act of May fifth into effect. Notice of the intention to present such petition to the court, and of the object thereof, was duly given by publication and posting, as required by section 9 of chapter 209 of the Laws of 1839. On the 16th of July, 1847, the said commissioners duly qualified, and thereafter various proceedings were taken by and had before them, all of which, together with their awards for damages and their assessments for benefits and descriptions of property required to be taken for the purpose of said improvement, were set forth in their report to the Supreme Court dated the 5th day of March, 1849.

On behalf of the plaintiffs, objections are made to the validity of these proceedings. In the first place, attention is called to the settled rule that where it is attempted to take lands from the owner by statutory proceedings, the require· ments of the statute must be strictly complied with, or the proceedings go for nothing. (*Doughty* v. *Hope,* 3 Den. 594; *People* v. *Hulburt,* 46 N. Y. 113; *Matter of City of Buffalo,* 78 id. 362.) It follows, of course, that the burden of showing strict compliance is upon the party claiming under the proceedings. (*Sharp* v. *Speir,* 4 Hill, 76.) One objection alleged is that "the proceedings were void because there is no proof that the Common Council duly authorized the same." The proof is that the resolution above referred to was adopted by the board of aldermen on May 6, 1847, and by the board of assistant aldermen on the same day, and was approved by the mayor on the day following. But the point of the objection is this, that by section 7 of an act entitled "An Act to amend the Charter of the City of New York," passed April 7, 1830 (Chap. 122), it is provided that all resolutions which shall recommend any specific improvement "involving *the appropriation of public monies,* or taxing or assessing *the citizens of said city,*" shall be published immediately after the adjournment of the board in all the newspapers employed by the corporation, and that "whenever a vote is taken in relation thereto, the ayes and noes shall be called and published in the same manner." The resolution in question was not so published, nor, when the vote was taken, were the ayes and noes called and published in the manner prescribed by the act. My opinion is that it was not necessary to do either; that the resolution of May sixth was sufficient in form and was properly adopted and approved; that it did not recommend an improvement "involving the appropriation of public monies, or taxing or assessing the citizens" of the city within the meaning of said section 7, and that, therefore, the objection should not be allowed.

A second objection is that the notice of the application for the appointment of commissioners of estimate and assessment was insufficient, in that it did not state "the nature and extent of the intended improvement," as required by section 2 of the act of 1839. It was stated in the said notice "That the nature and extent of the improvement intended is the opening of the Bloomingdale Road in the said City from the Seventh Avenue to the Tenth Avenue." The same point was made and was sustained in *Matter of Commissioners of Central Park* (51 Barb. 277), and the court, referring to the provision of said section 2, said: "Under this provision I think it is necessary that the *whole extent* of the intended opening should be stated in the notice. The owners are to be informed *by it* what property is to be taken." Certainly, there was nothing in the published notice in question that informed the owners of property along the line of the Bloomingdale road what, if any, portion of their property would be required for the contemplated improvement. Counsel argues that the act of 1847 was referred to in the notice, and that the law presumes that every citizen knew what the act provided, and so knew the boundaries of the land which it was proposed to take, and that, therefore, the statement in the notice of the nature and extent of the improvement was quite sufficient. He is mistaken as to the fact. The notice made no reference to the act, but if it had, it would not have satisfied the rule declared in the case last cited. In that case the notice contained a general description of the property included in the proposed improvement — "as shown and delineated on a certain map of the same made by Gardner A. Sage, city surveyor, and now on file in the office of the Commissioners of Central Park." The court said (p. 304): "A reference to a map on file in some public office is not a compliance with the statute."

A third objection is that the commissioners of estimate and assessment did not give such notice of making their report as the act of 1839 prescribed, because the notice given by them did not require parties or owners affected to present their objections to *the commissioners*. Section 5 of the act of 1839 provided that any person or persons whose rights might be affected by the estimate and assessment, and who should object to the same, might, within thirty days after the first publication of the notice referred to, state his, her or their objections in writing "to the said commissioners." The notice as published requested all persons who might be opposed to the estimate and assessment to present their objections to "John R. Maurice, Esq., the Chairman of the said Commissioners," at his residence in Spring street. There is no merit in this objection. The statute declares to whom an objecting party must state his objections. It does not require the commissioners to give any notice of the time when or place where or the persons to whom such objections must be presented. Herein the case differs from *Adriance* v. *McCafferty* (2 Robt. 153). In that case the statute (Laws of 1841, chap. 171, § 1) expressly provided that the notice to be given should "contain a request for all persons * * * to present their objections in writing to *the chairman* of the commissioners or assessors." It was held that a notice requiring objections to be presented to "the undersigned" (the *assessors*) did not satisfy the statute.

A fourth objection is that there is no legal proof that the report of the commissioners was confirmed by the court. The burden of showing confirmation was

upon the defendant. By section 178 of chapter 86 of the Revised Laws of 1813 confirmation was required to be "by rule or order." No such rule or order has been produced. There is no direct proof that any was ever made. None has been found in the office of the county clerk, though diligently searched for. The defendant, however, insists that the fact that the court did make an order confirming the report is clearly established by the proofs he has offered, which consist of the following:

*First.* Testimony of Mr. Harkness that about December, 1900, he examined the report of the commissioners, and that there was then a cover (now missing) on such report, on which was written — "The foregoing report of the commissioners confirmed by the Supreme Court in General Term, March 31, 1849. James Connor, Clerk." It is proved that James Connor was at that date clerk of the county of New York. When or by whom the said indorsement was written does not appear.

*Second.* An entry in a book produced from the office of the commissioner of public works entitled — "Assessment Ledger C. Openings. Street Commissioner's Office." On page 12 of the said book, under the heading — "Broadway opening from Seventh to Tenth Avenues " — is a summary statement of assessments and awards, and then the following: "Confirmed by the Supreme Court March 31, 1849. Ordered open by the Common Council August 1, 1849. Awards payable December 1, 1849."

*Third.* An entry in a book produced from the bureau of the collector of assessments and arrears entitled — "Assessments. Avenues and Streets. 1839 to 1853. Street Commissioner's Office." On pages 334 to 400 inclusive is contained an amended abstract of the estimates and assessments of the commissioners appointed "In the matter of the application of the Mayor, Aldermen and Commonalty of the City of New York, relative to the opening of Bloomingdale Road from the Seventh to the Tenth Avenue in the Twelfth Ward of said city " — and at the foot of page 400 is written — "Confirmed March 31, 1849. Ordered open August 1, 1849. Abner Sandford, Collector."

*Fourth.* Publication of the confirmation of the report by the court in the list of decisions of the General Term printed in the daily papers, to wit, in the *Evening Post* of March 31, 1849; in the *Herald* of April first, and in the *Tribune* and *Morning Express* of April second.

*Fifth.* Resolution — adopted by the board of assistant aldermen on July 12, 1849, and by the board of aldermen on July sixteenth, and approved by the mayor on July eighteenth — "that the actual widening of Bloomingdale Road between Seventh Avenue and Tenth Avenue take place on the first day of August next ensuing, and that Abner Sandford be, and he is hereby, appointed to collect the assessments laid for that purpose."

*Sixth.* Payment by the city to parties damaged by the opening of the damages awarded, and payment *to* the city by parties assessed for benefit of the sums assessed.

Passing by the question of the competency of these items of evidence, and giving to them all the probative force that can reasonably be claimed for them, they show that the application to confirm the report of the commissioners was

granted by the court, and that thereafter the new street was opened by direction of the common council, and that parties (or some of them) whose lands were taken for the purposes of the improvement were paid the damages awarded to them out of assessments levied upon property found to be benefited. They do not show that the decision of the court was ever made complete and effective by a rule or order, or that it was ever made a record of the court or entered in the minutes of the court as a part of its proceedings, as in *Gerity* v. *Seeger & G. Co.* (163 N. Y. 119). There was no law, statute or rule of court that required the clerk to indorse the action of the General Term upon the motion papers, or that required any memorandum of that action to be inserted in any record relating to street openings kept in any office or bureau or department of the city government. Neither the indorsement on the report nor the entry in the assessment ledger is an official record in any proper sense, nor is either made " presumptive evidence of " its contents by section 955 of the Code of Civil Procedure, as argued by counsel. (*Board of Water Commissioners of Cohoes* v. *Lansing*, 45 N. Y. 21; *Parr* v. *Village of Greenbush,*72 id. 471; *Tripler* v. *Mayor*, 125 id. 623.) The learned counsel for the defendant says that " the object of all evidence is to produce conviction." This is true. Conviction is belief, and we may all reasonably believe, and probably all the parties to this controversy do believe, that the court did make an order confirming the report of the commissioners, and that the common council did not proceed to open the new street until such order was duly signed and entered. But such belief is born of inferences from facts and incidents which, it seems to me, do not make up for the utter absence of direct proof which the law requires in cases where the property of one is forcibly taken from him by authority of a statute and bestowed upon another. In such cases presumptions have small place. (*Sharp* v. *Speir*, 4 Hill, 86; *Adams* v. *S. & W. R. R. Co.*, 10 N. Y. 328; *People* v. *Hulburt*, 46 id. 110; *Hilton* v. *Bender*, 69 id. 76; *Matter of City of Buffalo*, 78 id. 366; *Elwood* v. *Northrup*, 106 id. 172.) The man who claims title through such a proceeding must prove strict compliance with the statute. If by the statute the proceeding is incomplete until approved by an order of court, he must show that the order was made. (*Cleveland* v. *Boerum,* 27 Barb. 254.) Proof that the court decided to grant the order is not sufficient. My conclusion is that this fourth objection should be sustained.

But if I am wrong in this, and if my conclusion ought to be that the facts proved fairly authorize the legal inference that an order of confirmation was made and entered, there remains one other objection from which it seems impossible to escape, and that is that the confirmation by the court was irregular and of no effect, because the notice given by the commissioners did not state where their report would be presented and the motion to confirm it be made. By section 3 of the act of 1839 it is made the duty of the commissioners " to report fully and separately to the said court the amount of loss and damage, and of benefit and advantage, to each and every owner, lessee, party and person entitled unto or interested in any lands, tenements, hereditaments or premises so required for the purpose of any such operation or improvement." Section 4 provides that they " shall give notice of the time *and place* of making their said report" by publication and posting for at least sixty days. The notice given by

the commissioners failed to state *where* the report would be made. It was as follows: " The said commissioners further give notice that their report in the above matter will be made and presented to the Supreme Court of the State of New York, before the Justices of the said court, on the first Monday of March next (being the 5th of March, 1849) at 10 o'clock in the forenoon of that day, or as soon thereafter as counsel can be heard, and that then and *there* a motion will be made to the said court that the said report be confirmed." I do not see how the case can be distinguished from that of *Matter of Broadway & Seventh Avenue R. R. Co.* (69 Hun, 275). That was a proceeding taken under the " Condemnation Law " —chapter 23 of the Code of Civil Procedure. Section 3361 requires that there must be annexed to the petition a notice of " the time and place " at which it will be presented to a Special Term of the Supreme Court held in the judicial district where the property is situated. The notice actually given was of an application " to the Special Term of the Supreme Court of New York, on Thursday, the 16th day of March." It was held that this was not a compliance with the law; that "no place whatever was mentioned," and that the statute required the petitioning party " to be precise and definite in his notice as to the place of presentation of his petition."

It is insisted by the defendant that, even if the proceedings were irregular or invalid, the plaintiffs are estopped from asserting the fact, for the reason that their predecessor in title (the trustee under the Hopper, Jr., will) accepted the award for damages made to him by the commissioners. My opinion is that this contention should be overruled. The premises in question belonged to John Hopper, the younger. He died in 1819 leaving a will, by the 2d clause of which he devised all his real estate in the city of New York unto his three grandchildren, Garrit Hopper Striker, Ann Striker and Wyntie Mott, and their heirs forever, " to be disposed of " by his executors as directed in said will. He directed that the said real estate should not be sold, but that his executors should, from time to time, lease the same and pay over the rents thereof annually to his " said heirs in equal proportions; " and that " in case any of my said heirs and devisees shall die without lawful issue, then and in such case my will is that the share of the one so dying shall be and enure to the sole use, \* \* \* benefit and behoof of my said grandchildren, and the survivor of them, and the heirs of such survivor forever." This will was construed by the grandchildren as vesting them with the fee simple of the property devised, and in 1820 Ann Striker began proceedings in the Mayor's Court to partition the Hopper farm. The only parties to those proceedings were the plaintiff and her brother Garrit and her sister Wyntie, each of whom claimed to be seized in fee of an equal one-third of the property of which partition was sought. Commissioners were appointed who made partition, dividing the farm into three parts, one of which they set off in severalty to Ann Striker, the plaintiff. The part so set off to her included all the land on both sides of the Bloomingdale road between Fifty-second and Fifty-third streets. Judgment confirming the report of the commissioners and decreeing an actual partition in accordance therewith was duly entered. In *Striker* v. *Mott* (28 N. Y. 82) it is stated that in April, 1821, partition deeds were executed between the parties for the respective parcels allotted in severalty to each, and that

the grandchildren thereafter enjoyed "in severalty, according to the partition." The Hopper will was afterwards brought into court for interpretation, and in *Brewster* v. *Striker* (2 N. Y. 19), and again in *Striker* v. *Mott* (*supra*), its meaning and effect were declared to be — that as to each one-third of the estate the executors, as trustees, took a legal estate by implication for the life of the grandchild for whose benefit the one-third was devised, with remainder in fee to the issue if any of that grandchild; and in default of such issue living at such grandchild's death, remainder to the survivors or survivor of the three grandchildren. In 1847, therefore, the situation was — that as to an undivided one-third the trustee had an estate for the life of Garrit H. Striker, in whose issue the remainder in fee was vested; as to another undivided one-third the trustee had an estate for the life of Winifred Mott, in whose issue the remainder in fee was vested; and as to the remaining undivided one-third there was an estate in the trustee for the life of Ann Striker, who was without issue, and a contingent remainder in fee in her brother Garrit and her sister Winifred. The trustee was Edward Sandford, who had been appointed in the stead of the trustees named in the will, all of whom had died. In the report of the commissioners of estimate and assessment appointed under the act of 1847, one of the parcels of land "required to be taken for the purpose of opening Bloomingdale Road" is described as commencing at the point of intersection of the northerly line of Fifty-second street and the easterly line of the road as *then* opened, and running easterly along the northerly line of Fifty-second street one foot and three inches "to the easterly line of the Bloomingdale Road as the same is *to be* opened;" thence northerly along the said new easterly line one hundred and seventy-two feet and two inches to land of Fitz and Johnson; thence westerly along said land five feet to "the easterly line of the present Bloomingdale Road as *now* opened and used;" and thence southerly along the last-mentioned line one hundred and seventy-three feet and six inches to the point of beginning. It was also stated in the said report that "Edward Sandford, trustee of John Hopper, deceased, is seized in fee of, in and to" the said parcel of land, and that the same was designated on Damage Map No. 1 as lot No. 27, and that "we, the said commissioners, do further report that we have estimated and assessed the loss and damage of the above named Edward Sandford, trustee of John Hopper, deceased, the owner of the said piece or parcel of land, * * * by and in consequence of the opening of Bloomingdale Road as aforesaid, and of the said owner relinquishing the said * * * piece or parcel of land for that purpose, to amount to the sum of two hundred and six dollars." This award was paid to Mr. Sandford on December 7, 1849, as appears by a receipt signed by him as "trustee of last will of John Hopper, deceased," contained in a book entitled — "Receipts. Avenues and Streets. C. Street Comm. Office"— now on file in the office of the president of the borough of Manhattan.

Lot 27, above referred to, was part of the share allotted to Ann Striker in severalty in the partition of 1820, which was afterwards declared to be invalid. The learned counsel for the defendant says that that share was held by Sandford as trustee for Ann Striker for her life. In a limited or qualified sense this is true. In *Striker* v. *Mott* (*supra*) it was held by the Supreme Court that the only

effect of the judgment in partition, and of the partition deeds, was to adjust the share of the rents and profits to which the devisees of John Hopper, Jr., would respectively be entitled during their lifetimes, and this conclusion seems to have been approved by the Court of Appeals. So that, as I understand it, Sandford, as trustee of the whole estate, was required by the agreement made between the three tenants for life to account to Ann for the rents and profits of the share set apart to her by the judgment and deeds. But the judgment and deeds in no way affected the title vested in the trustee, which was an estate in each undivided one-third for the life of the grandchild " for whose benefit that third was devised." The trustee took only such an estate or interest in the devised premises as the purposes of the trust required. (*Nicoll* v. *Walworth*, 4 Den. 388.) His powers were limited by his duties. He had no power of sale. Sale or alienation of the property was expressly forbidden by the testator. His direction was that his executors should "from time to time lease or rent the same on such terms and for such rent as they may deem most advantageous to my said heirs," and pay over the rents, issues and profits to the said heirs in equal proportions. Upon the death of a grandchild the trust ceased as to his or her undivided share, and the remaindermen in fee became at once entitled to its possession. The question then is whether Sandford, as trustee, having only such an estate and possessing only such powers as are narrated above, could, by any act or omission on his part, confer upon another party a greater estate or interest than he himself possessed. He was trustee for the life tenants only; by their deaths his office as trustee, with its estates, powers and duties, would be terminated: could he, by any act done by him while in office and in his character and capacity as trustee, destroy or diminish the vested estates and interests of the remaindermen, over which estates he had no power, none having been given to him by the will? (*Losey* v. *Stanley*, 147 N. Y. 567; *Matter of Armory Board*, 29 Misc. Rep. 181.) The authorities answer the question in the negative. Neither *Brooklyn Park Commissioners* v. *Armstrong* (45 N. Y. 239), nor *Bennett* v. *Garlock* (79 id. 302), cited by the defendant, holds a contrary doctrine. In both of those cases the facts were very essentially different from those in the case at bar.

Another claim made by the defendant deserves brief consideration. Asserting that the proceedings under the act of 1847 were valid, he contends that their effect was to divest the Hopper heirs of whatever interests they may have had in the Bloomingdale roadbed and to transfer them to the city. I cannot agree with him in this contention. It is not disputed that, under the provisions of the act of 1813, a qualified fee of land taken for streets vests in the city in trust for public use. That act and its amendments provided for public notice to all parties interested, and for awards for damage, and for assessments for benefit, and for compensation to owners for all lands and interests in lands taken for street improvements. It is made the duty of the commissioners " to proceed to and make a just and equitable estimate and assessment of the loss and damage, if any, over and above the benefit and advantage, or of the benefit and advantage, if any, over and above the loss and damage, as the case may be, to the respective owners, lessees, parties and persons respectively entitled unto or interested in the lands * * * so required," etc. In cases where, in the opinion of the com-

missioners, the benefit and advantage to any owner shall be equal to the loss and damage suffered by him by reason of said improvements " and the relinquishment of the lands * * * required," the commissioners are directed to report that, for that reason, the owner will suffer no damage "in consequence of making such * * * improvement and relinquishing the lands." The commissioners are also required in their report to set forth the names of the respective owners of and parties interested in the lands and premises " mentioned in the said report" so far as the same can be ascertained by them, and also "an apt and sufficient designation or description of the respective lots or parcels of land * * * and premises " that may be required for the purpose of opening, extending, enlarging or improving a place, street or avenue; and it is declared that the report, when confirmed, shall be final and conclusive upon the city and upon all parties interested in the lands and premises "mentioned in the said report," and that upon such confirmation the city shall become and be seized in fee of all the lands and premises "in the said report mentioned" that shall or may be required for the purpose of the improvement., All of these provisions are expressly made applicable to any lands or premises belonging to the city or in which the city may be interested. If any portion of such lands is taken, the city is entitled to compensation; and if any portion is benefited by the improvement, the city must pay for such benefit "in like manner as other owners and proprietors of lands and premises required for the purpose of making the said * * * improvement, or deemed to be benefited thereby." (See R. L. 1813, chap. 86, § 178.)

It is sufficient to say that there is nothing before me to show that the commissioners dealt in any manner with the bed of the Bloomingdale road. They did not assume to determine to whom it belonged. They made no award for compensation. They gave no reason for their omission to do so. They simply said nothing about it beyond reporting that "said Bloomingdale road is a street in that part of the said city of New York laid out into streets, avenues, squares and public places by the Commissioners of Streets and Roads" under the act of April 3, 1807. No claim or suggestion is made that it was a street opened under that act. On the contrary, it is asserted by the learned counsel for the defendant that chapter 223 of the Laws of 1838 was a recognition by legislative act of the fact that, by the filing of the commissioners' map under the act of 1807 the road had been legally closed or discontinued. Further, the road was not "mentioned in the said report" within the meaning of section 178 of the statute of 1813, and would not, therefore, have been within the operation of an order of confirmation if such order had been regularly made. My conclusions on this branch of the case are, that the defendant has failed to sustain the validity of the proceedings under the act of 1847; that the plaintiffs are not estopped to assert the invalidity of the proceedings by the trustee's acceptance of the award, and that even if the proceedings had been regular and valid, or if the acceptance of the award had been effectual as an estoppel, the only property affected would have been the several parcels particularly described in the report as belonging to the trustee, including the narrow strip taken from the front of the block between Fifty-second and Fifty-third streets on the easterly side of the Bloomingdale road.

Ann Striker, one of the three grandchildren of John Hopper, Jr., died without

issue in 1860. Winifred Mott, another of said grandchildren, died leaving issue in 1862. In 1863 Garrit H. Striker, the survivor, began an action in this court for the partition of the Hopper farm, alleging that he and the defendants were owners in common of twenty-four tracts or parcels of land which were specifically described in his complaint. Parcel No. 4 was described as bounded on the north by land of several owners, and on the east by the westerly line of Seventh avenue, and on the south by the northerly line of Fifty-second street, and on the west by the easterly side of Broadway. Parcel No. 7 was described as bounded on the north by the southerly line of Fifty-third street and land of Jacob Harsen, and on the east by the westerly line of Broadway, and on the south by the northerly line of Fifty-second street, and on the west by the easterly side of the Eighth avenue. To each of these descriptions was subjoined the following: "Together with all the right, interest, claim and demand whatsoever, present or prospective, vested or contingent, of the owners of such last mentioned tract, piece or parcel of land in the streets and avenues adjoining the same by reason of the beds of such streets and avenues, or any part thereof having been taken pursuant to the statutes in that behalf made and provided, from such owners to form such streets and avenues."

The commissioners appointed to make partition divided the said twenty-four tracts or parcels into city lots, which were designated by numbers upon a map prepared and filed by them. Lots 79, 80, 81 and 82, situated on the easterly side of Broadway between Fifty-second and Fifty-third streets, were allotted to Garrit Striker Mott. Lots 83, 84 and 85, situated on the westerly side of Broadway between said streets, were allotted to Ruth Ann Mott. In the commissioners' report lots 79, 80, 81 and 82 are described as follows: "Beginning at a point in the _easterly side_ of Broadway, distant twenty-nine feet and seven inches southwardly from the southerly side of Fifty-third Street, and running thence southwardly along said _easterly side_ of Broadway, ninety-nine feet ten and one-half inches; thence eastwardly, on a line parallel with said Fifty-third Street one hundred and fifteen feet six and one-half inches to the west side of Seventh Avenue; thence northwardly, along said westerly side of Seventh Avenue, seventy-seven feet and five inches to land of several owners; and thence northwestwardly, along said lands of several owners, one hundred and forty-one feet six and seven-eighths inches to said _easterly side_ of Broadway at the place of beginning." The same form of description is applied to lots 83, 84 and 85. It begins at a point on the _westerly side_ of Broadway; the northerly boundary line extends eastwardly to said _westerly side_ of Broadway, and the easterly boundary is the "said _westerly side_ of Broadway * * * to the place of beginning." The easterly and westerly sides referred to are the lines of Broadway established by the proceedings under the act of 1847. The final judgment in the partition action, which confirmed the commissioners' report, was entered on July 10, 1865. In it the descriptions of the lots or parcels allotted in severalty to each of the several owners in common followed in all particulars of lot numbers, courses and distances those set forth in the report, and the question is whether the effect of the judgment was to vest in Garrit Striker Mott and Ruth Ann Mott title to whatever interest the owners in common had in the Bloomingdale road or Broadway in front of the lots allotted to them respec-

tively. The defendant insists that such was its effect. The plaintiffs, on the contrary, contend that the judgment operated only upon the lands and premises specifically described in it; that Garrit Mott and Ruth Mott took no rights or interests in the bed of the street, but were limited in their ownerships in severalty to the sides of Broadway which were their boundary lines; and that the rights and interests of the tenants in common in the bed of the street were not partitioned or otherwise affected by the judgment.

Whether a conveyance of lands adjacent to a street carries title to the center or only to the side or exterior line of the street, depends in part upon the language used in describing the premises conveyed and in part upon the intention of the parties. Ordinarily, where the land is bounded by or upon a street, the grantee takes to the center, the presumption being that the grantor did not intend to reserve the fee of the highway, it being no longer of any importance or benefit to him. (*Graham* v. *Stern*, 168 N. Y. 521.) But this presumption may be overcome by evidence that the parties intended differently. It is also a well-settled general rule that where the premises conveyed are bounded by the *side* of a street, the grantee's title does not extend into the bed of the street, but stops at the exterior line. (*Jackson* v. *Hathaway*, 15 Johns. 447; *English* v. *Brennan*, 60 N. Y. 609; *Kings County Fire Ins. Co.* v. *Stevens*, 87 id. 287; *Blackman* v. *Riley*, 138 id. 318; *Deering* v. *Reilly*, 167 id. 184.) If, however, it is made to appear that it was intended that the grant should include the fee of the street, effect will be given to that intention. (*Potter* v. *Boyce*, 73 App. Div. 383.) In that case the court said: "Of course, if the property is conveyed by metes and bounds which expressly exclude the street, as where a piece of property is expressly bounded upon the side of a street, so that by no construction can the fee of the street be included, the court is not justified in giving to such description a construction which would convey property outside of the limits of the property expressly conveyed." And further: "If the starting point in the description in this case had been on the easterly side of Bloomingdale road and the north side of Hamilton Street, and the line had run thence to the west side of Phineas Street, a different question would be presented." There is nothing in the present case tending in any degree to show that the commissioners in partition intended to allot to Garrit Mott and Ruth Mott any interest in any premises outside of the premises described with particularity in their report. The boundary lines of those premises necessarily excluded any interest in the fee of the street. In the one case they start at a point in the easterly side of Broadway and run thence southwardly along said easterly side, etc., and return "to said easterly side of Broadway at the place of beginning." In the other case they start at a point in the westerly side of Broadway and run thence westwardly and northwardly and eastwardly "to said westerly side of Broadway, and thence southwardly, along said westerly side of Broadway * * * to the place of beginning."

It is argued that the purpose of the action brought by Garrit H. Striker was to partition all property held in common by the parties, including all their interests in the streets bounding the different parcels described in the complaint, and that it must be presumed that the commissioners, in making their allotments, intended to effectuate that purpose, and so intended that the lots fronting on the

streets should carry with them the street rights whatever they might be. It seems to be an answer to this suggestion that if the commissioners did so intend, they defeated their intention by the language which they employed in the descriptions, and that the rights of all parties were fixed and settled by the judgment of the court, whether it granted all or only a part of the relief claimed in the complaint. In *Bartow* v. *Draper* (5 Duer, 130) the question arose whether the description of a lot set apart by commissioners in partition carried title to the center of Cross street. The court held that it did not, and that if the heirs collectively had a right to the street it remained a part "of the undivided estate of their ancestor." A similar question was involved in *Van Amringe* v. *Barnett* (8 Bosw. 357). A suit was brought to partition among the heirs of Youle a tract of land of which Youle had died seized. It was held that the master's deed conveying a parcel, one boundary of which ran to the "southeasterly side" of the Kingsbridge road, and thence "along the said southeasterly side," granted no interest in the bed of the road, the title to which remained in the heirs of Youle. In *Jones* v. *Cowman* (2 Sandf. 234) mortgaged premises, which included one-half of a lane twenty feet in width, were sold under a decree in foreclosure. The master's deed described the premises conveyed as bounded by "the northerly line or side" of the lane. It was held that the purchaser took according to the description and nothing more, and that he acquired no title to the lane or any part thereof. In each of these cases the court followed the established rule that "nothing passes by a deed except what is described in it, whatever the intention of the parties may have been." (*Coleman* v. *Manhattan Beach Imp. Co.*, 94 N. Y. 232; *Thayer* v. *Finton*, 108 id. 397.) The fact that in the report of the commissioners in partition the lots set apart in severalty to Garrit Mott and Ruth Mott were identified or described as "designated on said map," that is, the map filed by the commissioners, by certain numbers, does not in any respect affect the rule of construction declared in the cases above cited. In no case to which my attention has been called has a reference in the deed to a map, or a description by a map number, been held to override a description by metes and bounds, where the boundary line was to and thence along the side of a street or highway. The authorities are the other way. (*Chapman* v. *Wheeler*, 5 Alb. L. J. [1872] 336, 337; *Augustine* v. *Britt*, 15 Hun, 395; affd., 80 N. Y. 647; *White's Bank of Buffalo* v. *Nichols*, 64 id. 65.)

On the 14th of March, 1865, Garrit S. Mott conveyed to Dudley Field the four lots designated on the map of the commissioners in partition as lots Nos. 79, 80, 81 and 82, the boundaries following those in the commissioners' report, and starting at a point in the *easterly side* of Broadway and running thence southwardly, along the easterly side of Broadway, 104 feet, and thence eastwardly to the westerly side of Seventh avenue, and thence northwardly, along the said westerly side of Seventh avenue, to a point, and thence westwardly to the "said easterly side of Broadway at the place of beginning." On the same day Ruth Ann Mott conveyed to Mr. Field the three lots designated on the said map as lots Nos. 83, 84 and 85, the boundaries being the same as those in the report, and starting at a point in the *westerly side* of Broadway, and running thence westwardly and northwardly and eastwardly to the westerly side of Broadway, "and thence south-

wardly, along said westerly side * * * to the place of beginning." The land which is the subject of this dispute was, at the time of these conveyances, a part of the bed of Broadway between the lots so conveyed to Field. As to the easterly portion of said land the defendant claims under a deed from Field, and as to the westerly portion he claims through Field under deeds from his grantees or their successors, and also, as to both portions, through proceedings taken for the widening and straightening of Broadway by authority of an act of the Legislature passed in May, 1869, to which particular reference will presently be made. So that the question is — What rights, if any, in the roadbed did Field acquire from Garrit and Ruth Mott? This is conclusively answered by the authorities cited above. There is nothing ambiguous in the description in either deed. The boundary lines are defined with great precision; all of the lots conveyed are expressly bounded upon *the side* of Broadway; therefore, as was said in *Potter* v. *Boyce* (*supra*), "by no construction can the fee of the street be included." This would be so if for any reason it should be held that under the decree in partition the Motts took to the center of the street. In *Blackman* v. *Riley* (138 N. Y. 318) one of the lots conveyed was described as beginning "at a point on the east side of the Bloomingdale road," and as running along the said east side, etc. In answer to the claim made by the defendant that it was clearly the intention of the grantors to convey to the grantees all their interest in the bed of the road, the court said (p. 324): "It is difficult to conceive of any reason for consciously reserving or failing to convey the roadbed of this road, subject to the public easement. We cannot think it was ever really intended, yet, nevertheless, we are disposed to hold that, by the language actually used, the grantors in fact failed to convey any portion of the land forming the bed of the road in question."

The defendant makes a further claim. In 1869 an act was passed (Chap. 890) entitled "An Act to alter the map or plan of the city of New York and to carry the alterations into effect." This act provided for the widening and straightening of Broadway between Thirty-fourth and Fifty-ninth streets under the direction of the Commissioners of the Central Park, who were to locate and establish the easterly and westerly lines thereof so that the street should be 100 feet in width. It further provided that the part of Broadway laid out and established by the said commissioners should be a part of one of the streets of the city of New York, in like manner and with the same effect as if the same had been laid out as a public street on the map or plan of the city by the commissioners appointed under the act of April 3, 1807; that if any part or parts of that part of Broadway as then existing should not be included within the lines of said street as located and established under the provisions of said act of 1869, "such part or parts shall be closed and the public use thereof shall be discontinued, and the map or plan of said city shall be changed accordingly;" that commissioners of estimate and assessment should be appointed, with power to assess one-third of the expense of the improvement upon the city; that "if any part or parts of Broadway shall be closed under the provisions of this act, any owner of land now fronting on Broadway, abutting on any part so closed, may acquire an exclusive right, title and interest of, in and to so much of any part so closed as lies between the present front line of the land owned by him and the line of Broadway as it may be so as

aforesaid located and established" upon payment to the chamberlain of the city, for the mayor, aldermen, etc., of the amount of any award by said commissioners of estimate and assessment "for the discontinuance of the public use of the land such owner is so entitled to acquire," and also upon payment to the said chamberlain, for the parties entitled thereto, of the amount of any award by the said commissioners "for the reversionary interest in such lands or any part thereof;" that no award should be made for the reversionary interest in case the parties having such interest should be entitled to acquire the land; and that all awards other than those made to the city should be paid by the chamberlain to the parties entitled thereto — provided, however, that the public use of any "piece of land, for which an award is made for the reversionary interest, shall not be discontinued, nor shall that part of the street be held to be closed, until the party entitled to the award for the reversionary interest shall, by accepting such award, release his interest in the land for which the award is made."

The Commissioners of the Central Park laid out the part of Broadway referred to in the 1st section of the said act of 1869, and located and established the easterly and westerly lines thereof, as they were commanded by said section. Between Fifty-second and Fifty-third streets the easterly line as located by them ran northerly from the point of intersection of the westerly side of Broadway with the northerly side of Fifty-second street to a point in the southerly side of Fifty-third street distant twenty-nine feet nine and five-eighths inches easterly from the point of intersection of the southerly side of Fifty-third street with the westerly side of Broadway. The westerly line was parallel thereto and distant one hundred feet six and seven-eighths inches therefrom. The discontinued portion of old Broadway lying between the easterly line of new Broadway as so located and the front line of said lots 79, 80 and 81 owned by Mr. Eno had a frontage on the new street of seventy-five feet five and one-tenths inches and a depth on its northerly side of fifty-five feet one and one-fifth inches and on its southerly side of sixty-six feet two and seven-tenths inches. This is the parcel over which these parties are contending. It was represented on the benefit map filed by the commissioners by lots 32, 33 and 34, as to each of which the commissioners reported that they had made an award to the mayor, aldermen and commonalty of the city of New York amounting to the sum of one dollar "for the discontinuance of the public use" thereof; and that it was "a part of that portion of Broadway closed under the provisions of the Act under which these proceedings are taken;" and that "the owner of the land lying on the northeasterly side of said Broadway, and now immediately fronting and abutting on the said hereinbefore mentioned and described piece or parcel of land, is the owner of the reversionary right and entitled to acquire the said piece or parcel of land." Concerning the narrow wedge-shaped piece of land, a part of the bed of old Broadway and lying between the westerly side of old Broadway and the easterly side of the new street, the commissioners reported that, as far as they could ascertain, the mayor, aldermen and commonalty were seized thereof in fee, and that the loss and damage to them as owners, in consequence of the taking of said parcel of land for the purposes of the improvement, was the sum of one dollar. Eno was assessed for benefit over damage on the said lots 79, 80 and 81 the sum of $9,807. This

sum he paid to the collector of assessments on the 11th of April, 1873, and on the 29th of January, 1873, he paid to the chamberlain the awards of one dollar each made to the city for the "discontinuance of the public use" of said lots on the commissioners' benefit map Nos. 32, 33 and 34.

At the time the proceedings under the act of 1869 were taken, lots 83 and 84 on the westerly side of Broadway, which had been conveyed to Field by Ruth Ann Mott in 1865, were owned by Peck and Godwin. In the commissioners' report they were described as bounded on the westerly side or line of Broadway. The roadbed in front of them was reported by the commissioners as belonging to the city. The parcel of ground in dispute here, being lots 32, 33 and 34 on the benefit map, extended across the center line to within a few feet of the westerly line of old Broadway, by which is meant Broadway as it was laid out and regulated under the act of 1847. In February, 1885, Godwin and the executors of Peck quitclaimed to Mr. Eno "all the land, formerly a part of old Broadway (except so much thereof as is now actually a part of the present Broadway) lying in front of said lots, Ward Nos. 41 and 42 (as said lots were on and prior to the fifth of July, eighteen hundred and seventy-two), which said Joseph H. Godwin and George H. Peck as owners of the said lots, or by said recited deeds, or by any other claim or title whatsoever, have or claim to have." This description would seem to apply to that portion of old Broadway lying between the center line thereof and the easterly line of Broadway as widened and located under the act of 1869 in front of the said lots 83 and 84 on the Mott partition map. So far as appears, Peck and Godwin at the date of said deed had no rights whatever in any part of the bed of Broadway.

Briefly stated, the claim of the defendant is, that the act of 1869 laid upon the commissioners of estimate and assessment the duty of determining "who was the owner of the reversionary interest in each part of the former bed of the Bloomingdale road which was not to be included in the new street;" that their determination, when confirmed by the court, was final; that the confirmation was in effect a judgment pronounced in a proceeding to which the city and the plaintiffs and the defendant were parties; that the plaintiffs are concluded by it, and that whatever rights they may have had in the disputed territory have, by operation of the statute and the proceedings under it, become vested in the defendant. On the other hand, the plaintiffs insist that the act of 1869 was unconstitutional in that it provided for the taking of private property for other than public use (referring to the provision relating to the acquisition of a "reversionary interest" by an abutting owner), and that the proceedings taken under the act were invalid because the commissioners made no award to the plaintiffs for the reversionary interests, and because of various irregularities and omissions in respect to the appointment of the commissioners and the giving of notices required by statute. It is not necessary to consider in detail the points made by counsel, for the claim asserted on the part of the defendant seems to be in direct opposition to the decision of the General Term in *Post* v. *Hazlett* (36 N. Y. St. Repr. 219). It was there held that the commissioners of estimate and assessment appointed under section 2 of the act of 1869 had no power to determine who was the owner of the reversionary interest in the roadbed. It is evi-

dent from the report of that case that the description in the deed to Livermore ran only to and then along *the side* of Fifty-third street, and the court said that the commissioners erred in assuming that Livermore was entitled to the reversionary right to the bed of the road because he was an abutting owner. I am obliged to find that the defendant acquired no title to any portion of the roadbed of old Broadway through the proceedings taken in execution of the act of 1869.

Finally, the defendant claims title by adverse possession. The argument is that the city entered into possession of the premises under the proceedings taken in 1847 for the laying out of a new street and for keeping open a part of the Bloomingdale road, claiming that it had acquired a fee in the roadbed; that its possession continued without interruption for a period of twenty years and until 1874, when the defendant entered; and that, by the payment of the awards made to the city for the discontinuance of the public use of the lands lying between the front of the lands owned by the defendant and the easterly line of Broadway as located and established under the act of 1869, the defendant succeeded to all the rights and title of the city in and to such lands. This action was commenced in April, 1893, and it is admitted that unless the city held adversely this defense must fail. My judgment is that as to the larger part of the premises the city did not hold adversely. It had no title to the roadbed of Broadway as it existed when the act of 1847 was passed. Its possession was "in subordination to the legal title" (*Deering* v. *Reilly,* 167 N. Y. 192), which I have concluded was in the Hopper heirs. For reasons already stated, it acquired no title to the roadbed by what was done to carry the act into effect. The commissioners of estimate and assessment dealt only with the parcels of land included in the boundaries defined in the act and lying outside of the then exterior lines of the Bloomingdale road. (*Speir* v. *Town of New Utrecht,* 121 N. Y. 430.) Therefore, the quality and extent of its possession thereafter remained unchanged. As to the narrow strip taken by the commissioners from the front of the block on the easterly side of Broadway between Fifty-second and Fifty-third streets, I think that the plaintiffs' title has been divested by the adverse possession, for upwards of forty years, of the city and the defendant. The city took possession in 1849, claiming title through the proceedings of 1847. Its right to enter and to occupy was not disputed until the commencement of this action. The fact that the proceedings were invalid does not help the plaintiffs. In *Eldridge* v. *City of Binghamton* (120 N. Y. 309) it was held that where the State had entered upon lands under color of title, claiming to own the fee pursuant to a statute, it acquired an absolute title by an undisturbed adverse possession for more than twenty years, even though the statute under which it claimed was unconstitutional.

The plaintiffs must have judgment. My opinion as to the extent of their recovery is pretty clearly indicated by what I have written, but counsel for the defendant desired to be heard further upon that point in case my conclusions were in favor of the plaintiffs, and his request is granted.

NOTE.— The rest of the cases of this term will be found in the next volume, 98 App. Div.— [REP.